# HAZELWOOD SCHOOL DISTRICT ET AL. *v.* KUHLMEIER ET AL.

No. 86–836.   Argued October 13, 1987—Decided January 13, 1988

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 277.

*Robert P. Baine, Jr.,* argued the cause for petitioners. With him on the briefs were *John Gianoulakis* and *Robert T. Haar.*

*Leslie D. Edwards* argued the cause and filed a brief for respondents.*

---

*\*Ronald A. Zumbrun* and *Anthony T. Caso* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Janet L. Benshoof, John A. Powell, Steven*

JUSTICE WHITE delivered the opinion of the Court.

This case concerns the extent to which educators may exercise editorial control over the contents of a high school newspaper produced as part of the school's journalism curriculum.

I

Petitioners are the Hazelwood School District in St. Louis County, Missouri; various school officials; Robert Eugene Reynolds, the principal of Hazelwood East High School; and Howard Emerson, a teacher in the school district. Respondents are three former Hazelwood East students who were staff members of Spectrum, the school newspaper. They contend that school officials violated their First Amendment rights by deleting two pages of articles from the May 13, 1983, issue of Spectrum.

Spectrum was written and edited by the Journalism II class at Hazelwood East. The newspaper was published every three weeks or so during the 1982–1983 school year. More than 4,500 copies of the newspaper were distributed during that year to students, school personnel, and members of the community.

The Board of Education allocated funds from its annual budget for the printing of Spectrum. These funds were supplemented by proceeds from sales of the newspaper. The printing expenses during the 1982–1983 school year totaled $4,668.50; revenue from sales was $1,166.84. The other costs associated with the newspaper—such as supplies, text-

R. Shapiro, and Frank Susman; for the American Society of Newspaper Editors et al. by Richard M. Schmidt, Jr.; for People for the American Way by Marvin E. Frankel; for the NOW Legal Defense and Education Fund et al. by Martha L. Minow, Sarah E. Burns, and Marsha Levick; for the Planned Parenthood Federation of America, Inc., et al. by Eve W. Paul; and for the Student Press Law Center et al. by J. Marc Abrams.

Briefs of amici curiae were filed for the National School Boards Association et al. by Gwendolyn H. Gregory, August W. Steinhilber, Thomas A. Shannon, and Ivan B. Gluckman; and for the School Board of Dade County, Florida, by Frank A. Howard, Jr., and Johnny Brown.

books, and a portion of the journalism teacher's salary—were borne entirely by the Board.

The Journalism II course was taught by Robert Stergos for most of the 1982–1983 academic year. Stergos left Hazelwood East to take a job in private industry on April 29, 1983, when the May 13 edition of Spectrum was nearing completion, and petitioner Emerson took his place as newspaper adviser for the remaining weeks of the term.

The practice at Hazelwood East during the spring 1983 semester was for the journalism teacher to submit page proofs of each Spectrum issue to Principal Reynolds for his review prior to publication. On May 10, Emerson delivered the proofs of the May 13 edition to Reynolds, who objected to two of the articles scheduled to appear in that edition. One of the stories described three Hazelwood East students' experiences with pregnancy; the other discussed the impact of divorce on students at the school.

Reynolds was concerned that, although the pregnancy story used false names "to keep the identity of these girls a secret," the pregnant students still might be identifiable from the text. He also believed that the article's references to sexual activity and birth control were inappropriate for some of the younger students at the school. In addition, Reynolds was concerned that a student identified by name in the divorce story had complained that her father "wasn't spending enough time with my mom, my sister and I" prior to the divorce, "was always out of town on business or out late playing cards with the guys," and "always argued about everything" with her mother. App. to Pet. for Cert. 38. Reynolds believed that the student's parents should have been given an opportunity to respond to these remarks or to consent to their publication. He was unaware that Emerson had deleted the student's name from the final version of the article.

Reynolds believed that there was no time to make the necessary changes in the stories before the scheduled press run

and that the newspaper would not appear before the end of the school year if printing were delayed to any significant extent. He concluded that his only options under the circumstances were to publish a four-page newspaper instead of the planned six-page newspaper, eliminating the two pages on which the offending stories appeared, or to publish no newspaper at all. Accordingly, he directed Emerson to withhold from publication the two pages containing the stories on pregnancy and divorce.[1] He informed his superiors of the decision, and they concurred.

Respondents subsequently commenced this action in the United States District Court for the Eastern District of Missouri seeking a declaration that their First Amendment rights had been violated, injunctive relief, and monetary damages. After a bench trial, the District Court denied an injunction, holding that no First Amendment violation had occurred. 607 F. Supp. 1450 (1985).

The District Court concluded that school officials may impose restraints on students' speech in activities that are "'an integral part of the school's educational function'"—including the publication of a school-sponsored newspaper by a journalism class—so long as their decision has "'a substantial and reasonable basis.'" *Id.*, at 1466 (quoting *Frasca* v. *Andrews*, 463 F. Supp. 1043, 1052 (EDNY 1979)). The court found that Principal Reynolds' concern that the pregnant students' anonymity would be lost and their privacy invaded was "legitimate and reasonable," given "the small number of pregnant students at Hazelwood East and several identifying characteristics that were disclosed in the article." 607 F. Supp., at 1466. The court held that Reynolds' action was also justified "to avoid the impression that [the school] en-

---

[1] The two pages deleted from the newspaper also contained articles on teenage marriage, runaways, and juvenile delinquents, as well as a general article on teenage pregnancy. Reynolds testified that he had no objection to these articles and that they were deleted only because they appeared on the same pages as the two objectionable articles.

dorses the sexual norms of the subjects" and to shield younger students from exposure to unsuitable material. *Ibid.* The deletion of the article on divorce was seen by the court as a reasonable response to the invasion of privacy concerns raised by the named student's remarks. Because the article did not indicate that the student's parents had been offered an opportunity to respond to her allegations, said the court, there was cause for "serious doubt that the article complied with the rules of fairness which are standard in the field of journalism and which were covered in the textbook used in the Journalism II class." *Id.*, at 1467. Furthermore, the court concluded that Reynolds was justified in deleting two full pages of the newspaper, instead of deleting only the pregnancy and divorce stories or requiring that those stories be modified to address his concerns, based on his "reasonable belief that he had to make an immediate decision and that there was no time to make modifications to the articles in question." *Id.*, at 1466.

The Court of Appeals for the Eighth Circuit reversed. 795 F. 2d 1368 (1986). The court held at the outset that Spectrum was not only "a part of the school adopted curriculum," *id.*, at 1373, but also a public forum, because the newspaper was "intended to be and operated as a conduit for student viewpoint." *Id.*, at 1372. The court then concluded that Spectrum's status as a public forum precluded school officials from censoring its contents except when " 'necessary to avoid material and substantial interference with school work or discipline . . . or the rights of others.' " *Id.*, at 1374 (quoting *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 511 (1969)).

The Court of Appeals found "no evidence in the record that the principal could have reasonably forecast that the censored articles or any materials in the censored articles would have materially disrupted classwork or given rise to substantial disorder in the school." 795 F. 2d, at 1375. School officials were entitled to censor the articles on the ground that

they invaded the rights of others, according to the court, only if publication of the articles could have resulted in tort liability to the school. The court concluded that no tort action for libel or invasion of privacy could have been maintained against the school by the subjects of the two articles or by their families. Accordingly, the court held that school officials had violated respondents' First Amendment rights by deleting the two pages of the newspaper.

We granted certiorari, 479 U. S. 1053 (1987), and we now reverse.

## II

Students in the public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker, supra,* at 506. They cannot be punished merely for expressing their personal views on the school premises—whether "in the cafeteria, or on the playing field, or on the campus during the authorized hours," 393 U. S., at 512–513—unless school authorities have reason to believe that such expression will "substantially interfere with the work of the school or impinge upon the rights of other students." *Id.,* at 509.

We have nonetheless recognized that the First Amendment rights of students in the public schools "are not automatically coextensive with the rights of adults in other settings," *Bethel School District No. 403* v. *Fraser,* 478 U. S. 675, 682 (1986), and must be "applied in light of the special characteristics of the school environment." *Tinker, supra,* at 506; cf. *New Jersey* v. *T. L. O.,* 469 U. S. 325, 341–343 (1985). A school need not tolerate student speech that is inconsistent with its "basic educational mission," *Fraser, supra,* at 685, even though the government could not censor similar speech outside the school. Accordingly, we held in *Fraser* that a student could be disciplined for having delivered a speech that was "sexually explicit" but not legally obscene at an official school assembly, because the school was entitled to "disassociate itself" from the speech in a man-

ner that would demonstrate to others that such vulgarity is "wholly inconsistent with the 'fundamental values' of public school education." 478 U. S., at 685–686. We thus recognized that "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board," *id.*, at 683, rather than with the federal courts. It is in this context that respondents' First Amendment claims must be considered.

## A

We deal first with the question whether Spectrum may appropriately be characterized as a forum for public expression. The public schools do not possess all of the attributes of streets, parks, and other traditional public forums that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague* v. *CIO,* 307 U. S. 496, 515 (1939). Cf. *Widmar* v. *Vincent,* 454 U. S. 263, 267–268, n. 5 (1981). Hence, school facilities may be deemed to be public forums only if school authorities have "by policy or by practice" opened those facilities "for indiscriminate use by the general public," *Perry Education Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 47 (1983), or by some segment of the public, such as student organizations. *Id.,* at 46, n. 7 (citing *Widmar* v. *Vincent*). If the facilities have instead been reserved for other intended purposes, "communicative or otherwise," then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community. 460 U. S., at 46, n. 7. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.,* 473 U. S. 788, 802 (1985).

The policy of school officials toward Spectrum was reflected in Hazelwood School Board Policy 348.51 and the Hazelwood East Curriculum Guide. Board Policy 348.51 provided that "[s]chool sponsored publications are developed within the adopted curriculum and its educational implications in regular classroom activities." App. 22. The Hazelwood East Curriculum Guide described the Journalism II course as a "laboratory situation in which the students publish the school newspaper applying skills they have learned in Journalism I." *Id.*, at 11. The lessons that were to be learned from the Journalism II course, according to the Curriculum Guide, included development of journalistic skills under deadline pressure, "the legal, moral, and ethical restrictions imposed upon journalists within the school community," and "responsibility and acceptance of criticism for articles of opinion." *Ibid.* Journalism II was taught by a faculty member during regular class hours. Students received grades and academic credit for their performance in the course.

School officials did not deviate in practice from their policy that production of Spectrum was to be part of the educational curriculum and a "regular classroom activit[y]." The District Court found that Robert Stergos, the journalism teacher during most of the 1982–1983 school year, "both had the authority to exercise and in fact exercised a great deal of control over *Spectrum.*" 607 F. Supp., at 1453. For example, Stergos selected the editors of the newspaper, scheduled publication dates, decided the number of pages for each issue, assigned story ideas to class members, advised students on the development of their stories, reviewed the use of quotations, edited stories, selected and edited the letters to the editor, and dealt with the printing company. Many of these decisions were made without consultation with the Journalism II students. The District Court thus found it "clear that Mr. Stergos was the final authority with respect to almost every aspect of the production and publication of *Spectrum,* including its content." *Ibid.* Moreover, after

each Spectrum issue had been finally approved by Stergos or his successor, the issue still had to be reviewed by Principal Reynolds prior to publication. Respondents' assertion that they had believed that they could publish "practically anything" in Spectrum was therefore dismissed by the District Court as simply "not credible." *Id.*, at 1456. These factual findings are amply supported by the record, and were not rejected as clearly erroneous by the Court of Appeals.

The evidence relied upon by the Court of Appeals in finding Spectrum to be a public forum, see 795 F. 2d, at 1372–1373, is equivocal at best. For example, Board Policy 348.51, which stated in part that "[s]chool sponsored student publications will not restrict free expression or diverse viewpoints within the rules of responsible journalism," also stated that such publications were "developed within the adopted curriculum and its educational implications." App. 22. One might reasonably infer from the full text of Policy 348.51 that school officials retained ultimate control over what constituted "responsible journalism" in a school-sponsored newspaper. Although the Statement of Policy published in the September 14, 1982, issue of Spectrum declared that "*Spectrum*, as a student-press publication, accepts all rights implied by the First Amendment," this statement, understood in the context of the paper's role in the school's curriculum, suggests at most that the administration will not interfere with the students' exercise of those First Amendment rights that attend the publication of a school-sponsored newspaper. It does not reflect an intent to expand those rights by converting a curricular newspaper into a public forum.[2] Fi-

[2] The Statement also cited *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969), for the proposition that "[o]nly speech that 'materially and substantially interferes with the requirements of appropriate discipline' can be found unacceptable and therefore be prohibited." App. 26. This portion of the Statement does not, of course, even accurately reflect our holding in *Tinker*. Furthermore, the Statement nowhere expressly extended the *Tinker* standard to the news and feature articles contained in a school-sponsored newspaper. The dissent

nally, that students were permitted to exercise some authority over the contents of Spectrum was fully consistent with the Curriculum Guide objective of teaching the Journalism II students "leadership responsibilities as issue and page editors." App. 11. A decision to teach leadership skills in the context of a classroom activity hardly implies a decision to relinquish school control over that activity. In sum, the evidence relied upon by the Court of Appeals fails to demonstrate the "clear intent to create a public forum," *Cornelius*, 473 U. S., at 802, that existed in cases in which we found public forums to have been created. See *id.*, at 802–803 (citing *Widmar* v. *Vincent*, 454 U. S., at 267; *Madison School District* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167, 174, n. 6 (1976); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 555 (1975)). School officials did not evince either "by policy or by practice," *Perry Education Assn.*, 460 U. S., at 47, any intent to open the pages of Spectrum to "indiscriminate use," *ibid.*, by its student reporters and editors, or by the student body generally. Instead, they "reserve[d] the forum for its intended purpos[e]," *id.*, at 46, as a supervised learning experience for journalism students. Accordingly, school officials were entitled to regulate the contents of Spectrum in any reasonable manner. *Ibid.* It is this standard, rather than our decision in *Tinker*, that governs this case.

## B

The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirma-

---

apparently finds as a fact that the Statement was published annually in Spectrum; however, the District Court was unable to conclude that the Statement appeared on more than one occasion. In any event, even if the Statement says what the dissent believes that it says, the evidence that school officials never intended to designate Spectrum as a public forum remains overwhelming.

tively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.[3]

Educators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school. Hence, a school may in its capacity as publisher of a school newspaper or producer of a school play "disassociate itself," *Fraser*, 478 U. S., at 685, not only from speech that would "substantially interfere with [its] work . . . or impinge upon the rights of other students," *Tinker*, 393 U. S., at 509, but also from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences.[4] A school must be able to set high standards for

---

[3] The distinction that we draw between speech that is sponsored by the school and speech that is not is fully consistent with *Papish* v. *University of Missouri Board of Curators*, 410 U. S. 667 (1973) *(per curiam)*, which involved an off-campus "underground" newspaper that school officials merely had allowed to be sold on a state university campus.

[4] The dissent perceives no difference between the First Amendment analysis applied in *Tinker* and that applied in *Fraser*. We disagree. The decision in *Fraser* rested on the "vulgar," "lewd," and "plainly offensive" character of a speech delivered at an official school assembly rather than on

the student speech that is disseminated under its auspices — standards that may be higher than those demanded by some newspaper publishers or theatrical producers in the "real" world—and may refuse to disseminate student speech that does not meet those standards.   In addition, a school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting.   A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with "the shared values of a civilized social order," *Fraser, supra,* at 683, or to associate the school with any position other than neutrality on matters of political controversy.   Otherwise, the schools would be unduly constrained from fulfilling their role as "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown* v. *Board of Education,* 347 U. S. 483, 493 (1954).

Accordingly, we conclude that the standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dis-

---

any propensity of the speech to "materially disrup[t] classwork or involv[e] substantial disorder or invasion of the rights of others."   393 U. S., at 513.   Indeed, the *Fraser* Court cited as "especially relevant" a portion of Justice Black's dissenting opinion in *Tinker* " 'disclaim[ing] any purpose . . . to hold that the Federal Constitution compels the teachers, parents, and elected school officials to surrender control of the American public school system to public school students.' "   478 U. S., at 686 (quoting 393 U. S., at 526).   Of course, Justice Black's observations are equally relevant to the instant case.

semination of student expression.[5]    Instead, we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.[6]

This standard is consistent with our oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.    See, *e. g.*, *Board of Education of Hendrick Hudson Central School Dist.* v. *Rowley*, 458 U. S. 176, 208 (1982); *Wood* v. *Strickland*, 420 U. S. 308, 326 (1975); *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968). It is only when the decision to censor a school-sponsored publication, theatrical production, or other vehicle of student expression has no valid educational purpose that the First Amendment is so "directly and sharply implicate[d]," *ibid.*, as to require judicial intervention to protect students' constitutional rights.[7]

---

[5] We therefore need not decide whether the Court of Appeals correctly construed *Tinker* as precluding school officials from censoring student speech to avoid "invasion of the rights of others," 393 U. S., at 513, except where that speech could result in tort liability to the school.

[6] We reject respondents' suggestion that school officials be permitted to exercise prepublication control over school-sponsored publications only pursuant to specific written regulations.   To require such regulations in the context of a curricular activity could unduly constrain the ability of educators to educate.   We need not now decide whether such regulations are required before school officials may censor publications not sponsored by the school that students seek to distribute on school grounds.   See *Baughman* v. *Freienmuth*, 478 F. 2d 1345 (CA4 1973); *Shanley* v. *Northeast Independent School Dist., Bexar Cty., Tex.*, 462 F. 2d 960 (CA5 1972); *Eisner* v. *Stamford Board of Education*, 440 F. 2d 803 (CA2 1971).

[7] A number of lower federal courts have similarly recognized that educators' decisions with regard to the content of school-sponsored newspapers, dramatic productions, and other expressive activities are entitled to substantial deference.   See, *e. g.*, *Nicholson* v. *Board of Education, Torrance Unified School Dist.*, 682 F. 2d 858 (CA9 1982); *Seyfried* v. *Wal-*

### III

We also conclude that Principal Reynolds acted reasonably in requiring the deletion from the May 13 issue of Spectrum of the pregnancy article, the divorce article, and the remaining articles that were to appear on the same pages of the newspaper.

The initial paragraph of the pregnancy article declared that "[a]ll names have been changed to keep the identity of these girls a secret." The principal concluded that the students' anonymity was not adequately protected, however, given the other identifying information in the article and the small number of pregnant students at the school. Indeed, a teacher at the school credibly testified that she could positively identify at least one of the girls and possibly all three. It is likely that many students at Hazelwood East would have been at least as successful in identifying the girls. Reynolds therefore could reasonably have feared that the article violated whatever pledge of anonymity had been given to the pregnant students. In addition, he could reasonably have been concerned that the article was not sufficiently sensitive to the privacy interests of the students' boyfriends and parents, who were discussed in the article but who were given no opportunity to consent to its publication or to offer a response. The article did not contain graphic accounts of sexual activity. The girls did comment in the article, however, concerning their sexual histories and their use or nonuse of birth control. It was not unreasonable for the principal to have concluded that such frank talk was inappropriate in a school-sponsored publication distributed to 14-year-old fresh-

---

*ton,* 668 F. 2d 214 (CA3 1981); *Trachtman* v. *Anker,* 563 F. 2d 512 (CA2 1977), cert. denied, 435 U. S. 925 (1978); *Frasca* v. *Andrews,* 463 F. Supp. 1043 (EDNY 1979). We need not now decide whether the same degree of deference is appropriate with respect to school-sponsored expressive activities at the college and university level.

men and presumably taken home to be read by students' even younger brothers and sisters.

The student who was quoted by name in the version of the divorce article seen by Principal Reynolds made comments sharply critical of her father. The principal could reasonably have concluded that an individual publicly identified as an inattentive parent—indeed, as one who chose "playing cards with the guys" over home and family—was entitled to an opportunity to defend himself as a matter of journalistic fairness. These concerns were shared by both of Spectrum's faculty advisers for the 1982–1983 school year, who testified that they would not have allowed the article to be printed without deletion of the student's name.[8]

Principal Reynolds testified credibly at trial that, at the time that he reviewed the proofs of the May 13 issue during an extended telephone conversation with Emerson, he believed that there was no time to make any changes in the articles, and that the newspaper had to be printed immediately or not at all. It is true that Reynolds did not verify whether the necessary modifications could still have been made in the articles, and that Emerson did not volunteer the information that printing could be delayed until the changes were made. We nonetheless agree with the District Court that the decision to excise the two pages containing the problematic articles was reasonable given the particular circumstances of this case. These circumstances included the very recent

---

[8] The reasonableness of Principal Reynolds' concerns about the two articles was further substantiated by the trial testimony of Martin Duggan, a former editorial page editor of the St. Louis Globe Democrat and a former college journalism instructor and newspaper adviser. Duggan testified that the divorce story did not meet journalistic standards of fairness and balance because the father was not given an opportunity to respond, and that the pregnancy story was not appropriate for publication in a high school newspaper because it was unduly intrusive into the privacy of the girls, their parents, and their boyfriends. The District Court found Duggan to be "an objective and independent witness" whose testimony was entitled to significant weight. 607 F. Supp. 1450, 1461 (ED Mo. 1985).

replacement of Stergos by Emerson, who may not have been entirely familiar with Spectrum editorial and production procedures, and the pressure felt by Reynolds to make an immediate decision so that students would not be deprived of the newspaper altogether.

In sum, we cannot reject as unreasonable Principal Reynolds' conclusion that neither the pregnancy article nor the divorce article was suitable for publication in Spectrum. Reynolds could reasonably have concluded that the students who had written and edited these articles had not sufficiently mastered those portions of the Journalism II curriculum that pertained to the treatment of controversial issues and personal attacks, the need to protect the privacy of individuals whose most intimate concerns are to be revealed in the newspaper, and "the legal, moral, and ethical restrictions imposed upon journalists within [a] school community" that includes adolescent subjects and readers. Finally, we conclude that the principal's decision to delete two pages of Spectrum, rather than to delete only the offending articles or to require that they be modified, was reasonable under the circumstances as he understood them. Accordingly, no violation of First Amendment rights occurred.[9]

The judgment of the Court of Appeals for the Eighth Circuit is therefore

*Reversed.*

---

[9] It is likely that the approach urged by the dissent would as a practical matter have far more deleterious consequences for the student press than does the approach that we adopt today. The dissent correctly acknowledges "[t]he State's prerogative to dissolve the student newspaper entirely." *Post,* at 287. It is likely that many public schools would do just that rather than open their newspapers to all student expression that does not threaten "materia[l] disrup[tion of] classwork" or violation of "rights that are protected by law," *post,* at 289, regardless of how sexually explicit, racially intemperate, or personally insulting that expression otherwise might be.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

When the young men and women of Hazelwood East High School registered for Journalism II, they expected a civics lesson. Spectrum, the newspaper they were to publish, "was not just a class exercise in which students learned to prepare papers and hone writing skills, it was a . . . forum established to give students an opportunity to express their views while gaining an appreciation of their rights and responsibilities under the First Amendment to the United States Constitution . . . ." 795 F. 2d 1368, 1373 (CA8 1986). "[A]t the beginning of each school year," *id.*, at 1372, the student journalists published a Statement of Policy—tacitly approved each year by school authorities—announcing their expectation that "*Spectrum,* as a student-press publication, accepts all rights implied by the First Amendment . . . . Only speech that 'materially and substantially interferes with the requirements of appropriate discipline' can be found unacceptable and therefore prohibited." App. 26 (quoting *Tinker* v. *Des Moines Independent Community School Dist.,* 393 U. S. 503, 513 (1969)).[1] The school board itself affirmatively guaranteed the students of Journalism II an atmosphere conducive to fostering such an appreciation and exercising the full panoply of rights associated with a free student press. "School sponsored student publications," it vowed, "will not restrict free expression or diverse viewpoints within the rules of responsible journalism." App. 22 (Board Policy 348.51).

---

[1] The Court suggests that the passage quoted in the text did not "exten[d] the *Tinker* standard to the news and feature articles contained in a school-sponsored newspaper" because the passage did not expressly mention them. *Ante,* at 269, n. 2. It is hard to imagine why the Court (or anyone else) might expect a passage that applies categorically to "a student-press publication," composed almost exclusively of "news and feature articles," to mention those categories expressly. Understandably, neither court below so limited the passage.

This case arose when the Hazelwood East administration breached its own promise, dashing its students' expectations. The school principal, without prior consultation or explanation, excised six articles—comprising two full pages—of the May 13, 1983, issue of Spectrum. He did so not because any of the articles would "materially and substantially interfere with the requirements of appropriate discipline," but simply because he considered two of the six "inappropriate, personal, sensitive, and unsuitable" for student consumption. 795 F. 2d, at 1371.

In my view the principal broke more than just a promise. He violated the First Amendment's prohibitions against censorship of any student expression that neither disrupts classwork nor invades the rights of others, and against any censorship that is not narrowly tailored to serve its purpose.

## I

Public education serves vital national interests in preparing the Nation's youth for life in our increasingly complex society and for the duties of citizenship in our democratic Republic. See *Brown* v. *Board of Education*, 347 U. S. 483, 493 (1954). The public school conveys to our young the information and tools required not merely to survive in, but to contribute to, civilized society. It also inculcates in tomorrow's leaders the "fundamental values necessary to the maintenance of a democratic political system . . . ." *Ambach* v. *Norwick*, 441 U. S. 68, 77 (1979). All the while, the public educator nurtures students' social and moral development by transmitting to them an official dogma of "'community values.'" *Board of Education* v. *Pico*, 457 U. S. 853, 864 (1982) (plurality opinion) (citation omitted).

The public educator's task is weighty and delicate indeed. It demands particularized and supremely subjective choices among diverse curricula, moral values, and political stances to teach or inculcate in students, and among various methodologies for doing so. Accordingly, we have traditionally re-

served the "daily operation of school systems" to the States and their local school boards. *Epperson* v. *Arkansas,* 393 U. S. 97, 104 (1968); see *Board of Education* v. *Pico, supra,* at 863–864. We have not, however, hesitated to intervene where their decisions run afoul of the Constitution. See *e. g., Edwards* v. *Aguillard,* 482 U. S. 578 (1987) (striking state statute that forbade teaching of evolution in public school unless accompanied by instruction on theory of "creation science"); *Board of Education* v. *Pico, supra* (school board may not remove books from library shelves merely because it disapproves of ideas they express); *Epperson* v. *Arkansas, supra* (striking state-law prohibition against teaching Darwinian theory of evolution in public school); *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624 (1943) (public school may not compel student to salute flag); *Meyer* v. *Nebraska,* 262 U. S. 390 (1923) (state law prohibiting the teaching of foreign languages in public or private schools is unconstitutional).

Free student expression undoubtedly sometimes interferes with the effectiveness of the school's pedagogical functions. Some brands of student expression do so by directly preventing the school from pursuing its pedagogical mission: The young polemic who stands on a soapbox during calculus class to deliver an eloquent political diatribe interferes with the legitimate teaching of calculus. And the student who delivers a lewd endorsement of a student-government candidate might so extremely distract an impressionable high school audience as to interfere with the orderly operation of the school. See *Bethel School Dist. No. 403* v. *Fraser,* 478 U. S. 675 (1986). Other student speech, however, frustrates the school's legitimate pedagogical purposes merely by expressing a message that conflicts with the school's, without directly interfering with the school's expression of its message: A student who responds to a political science teacher's question with the retort, "socialism is good," subverts the school's inculcation of the message that capitalism is better.

Even the maverick who sits in class passively sporting a symbol of protest against a government policy, cf. *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969), or the gossip who sits in the student commons swapping stories of sexual escapade could readily muddle a clear official message condoning the government policy or condemning teenage sex. Likewise, the student newspaper that, like Spectrum, conveys a moral position at odds with the school's official stance might subvert the administration's legitimate inculcation of its own perception of community values.

If mere incompatibility with the school's pedagogical message were a constitutionally sufficient justification for the suppression of student speech, school officials could censor each of the students or student organizations in the foregoing hypotheticals, converting our public schools into "enclaves of totalitarianism," *id.*, at 511, that "strangle the free mind at its source," *West Virginia Board of Education* v. *Barnette, supra*, at 637. The First Amendment permits no such blanket censorship authority. While the "constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Fraser, supra*, at 682, students in the public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker, supra*, at 506. Just as the public on the street corner must, in the interest of fostering "enlightened opinion," *Cantwell* v. *Connecticut*, 310 U. S. 296, 310 (1940), tolerate speech that "tempt[s] [the listener] to throw [the speaker] off the street," *id.*, at 309, public educators must accommodate some student expression even if it offends them or offers views or values that contradict those the school wishes to inculcate.

In *Tinker*, this Court struck the balance. We held that official censorship of student expression—there the suspension of several students until they removed their armbands protesting the Vietnam war—is unconstitutional unless the

speech "materially disrupts classwork or involves substantial disorder or invasion of the rights of others . . . ."  393 U. S., at 513.  School officials may not suppress "silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of" the speaker.  *Id.*, at 508.  The "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," *id.*, at 509, or an unsavory subject, *Fraser, supra,* at 688–689 (BRENNAN, J., concurring in judgment), does not justify official suppression of student speech in the high school.

This Court applied the *Tinker* test just a Term ago in *Fraser, supra,* upholding an official decision to discipline a student for delivering a lewd speech in support of a student-government candidate.  The Court today casts no doubt on *Tinker*'s vitality.  Instead it erects a taxonomy of school censorship, concluding that *Tinker* applies to one category and not another.  On the one hand is censorship "to silence a student's personal expression that happens to occur on the school premises."  *Ante*, at 271.  On the other hand is censorship of expression that arises in the context of "school-sponsored . . . expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school."  *Ibid.*

The Court does not, for it cannot, purport to discern from our precedents the distinction it creates.  One could, I suppose, readily characterize the students' symbolic speech in *Tinker* as "personal expression that happens to [have] occur[red] on school premises," although *Tinker* did not even hint that the personal nature of the speech was of any (much less dispositive) relevance.  But that same description could not by any stretch of the imagination fit Fraser's speech. He did not just "happen" to deliver his lewd speech to an ad hoc gathering on the playground.  As the second paragraph of *Fraser* evinces, if ever a forum for student expression was "school-sponsored," Fraser's was:

"Fraser . . . delivered a speech nominating a fellow student for student elective office. Approximately 600 high school students . . . attended the assembly. Students were required to attend the assembly or to report to the study hall. The assembly was part of a *school-sponsored* educational program in self-government." *Fraser*, 478 U. S., at 677 (emphasis added).

Yet, from the first sentence of its analysis, see *id.*, at 680, *Fraser* faithfully applied *Tinker*.

Nor has this Court ever intimated a distinction between personal and school-sponsored speech in any other context. Particularly telling is this Court's heavy reliance on *Tinker* in two cases of First Amendment infringement on state college campuses. See *Papish* v. *University of Missouri Board of Curators*, 410 U. S. 667, 671, n. 6 (1973) *(per curiam); Healy* v. *James*, 408 U. S. 169, 180, 189, and n. 18, 191 (1972). One involved the expulsion of a student for lewd expression in a newspaper that she sold on campus pursuant to university authorization, see *Papish, supra*, at 667–668, and the other involved the denial of university recognition and concomitant benefits to a political student organization, see *Healy, supra*, at 174, 176, 181–182. Tracking *Tinker*'s analysis, the Court found each act of suppression unconstitutional. In neither case did this Court suggest the distinction, which the Court today finds dispositive, between school-sponsored and incidental student expression.

## II

Even if we were writing on a clean slate, I would reject the Court's rationale for abandoning *Tinker* in this case. The Court offers no more than an obscure tangle of three excuses to afford educators "greater control" over school-sponsored speech than the *Tinker* test would permit: the public educator's prerogative to control curriculum; the pedagogical interest in shielding the high school audience from objectionable viewpoints and sensitive topics; and the school's need

to dissociate itself from student expression. *Ante,* at 271. None of the excuses, once disentangled, supports the distinction that the Court draws. *Tinker* fully addresses the first concern; the second is illegitimate; and the third is readily achievable through less oppressive means.

A

The Court is certainly correct that the First Amendment permits educators "to assure that participants learn whatever lessons the activity is designed to teach . . . ." *Ante,* at 271. That is, however, the essence of the *Tinker* test, not an excuse to abandon it. Under *Tinker,* school officials may censor only such student speech as would "materially disrup[t]" a legitimate curricular function. Manifestly, student speech is more likely to disrupt a curricular function when it arises in the context of a curricular activity—one that "is designed to teach" something—than when it arises in the context of a noncurricular activity. Thus, under *Tinker,* the school may constitutionally punish the budding political orator if he disrupts calculus class but not if he holds his tongue for the cafeteria. See *Consolidated Edison Co.* v. *Public Service Comm'n of New York,* 447 U. S. 530, 544–545 (1980) (STEVENS, J., concurring in judgment). That is not because some more stringent standard applies in the curricular context. (After all, this Court applied the same standard whether the students in *Tinker* wore their armbands to the "classroom" or the "cafeteria." 393 U. S., at 512.) It is because student speech in the noncurricular context is less likely to disrupt materially any legitimate pedagogical purpose.

I fully agree with the Court that the First Amendment should afford an educator the prerogative not to sponsor the publication of a newspaper article that is "ungrammatical, poorly written, inadequately researched, biased or prejudiced," or that falls short of the "high standards for . . . student speech that is disseminated under [the school's] auspices . . . ." *Ante,* at 271–272. But we need not abandon *Tinker*

to reach that conclusion; we need only apply it. The enumerated criteria reflect the skills that the curricular newspaper "is designed to teach." The educator may, under *Tinker*, constitutionally "censor" poor grammar, writing, or research because to reward such expression would "materially disrup[t]" the newspaper's curricular purpose.

The same cannot be said of official censorship designed to shield the *audience* or dissociate the *sponsor* from the expression. Censorship so motivated might well serve (although, as I demonstrate *infra*, at 285–289, cannot legitimately serve) some other school purpose. But it in no way furthers the curricular purposes of a student *newspaper*, unless one believes that the purpose of the school newspaper is to teach students that the press ought never report bad news, express unpopular views, or print a thought that might upset its sponsors. Unsurprisingly, Hazelwood East claims no such pedagogical purpose.

The Court relies on bits of testimony to portray the principal's conduct as a pedagogical lesson to Journalism II students who "had not sufficiently mastered those portions of the . . . curriculum that pertained to the treatment of controversial issues and personal attacks, the need to protect the privacy of individuals . . . , and 'the legal, moral, and ethical restrictions imposed upon journalists . . . .'" *Ante*, at 276. In that regard, the Court attempts to justify censorship of the article on teenage pregnancy on the basis of the principal's judgment that (1) "the [pregnant] students' anonymity was not adequately protected," despite the article's use of aliases; and (2) the judgment that "the article was not sufficiently sensitive to the privacy interests of the students' boyfriends and parents . . . ." *Ante*, at 274. Similarly, the Court finds in the principal's decision to censor the divorce article a journalistic lesson that the author should have given the father of one student an "opportunity to defend himself" against her charge that (in the Court's words) he "chose

'playing cards with the guys' over home and family . . . ."
*Ante*, at 275.

But the principal never consulted the students before censoring their work. "[T]hey learned of the deletions when the paper was released . . . ." 795 F. 2d, at 1371. Further, he explained the deletions only in the broadest of generalities. In one meeting called at the behest of seven protesting Spectrum staff members (presumably a fraction of the full class), he characterized the articles as " 'too sensitive' for 'our immature audience of readers,' " 607 F. Supp. 1450, 1459 (ED Mo. 1985), and in a later meeting he deemed them simply "inappropriate, personal, sensitive and unsuitable for the newspaper," *ibid.* The Court's supposition that the principal intended (or the protesters understood) those generalities as a lesson on the nuances of journalistic responsibility is utterly incredible. If he did, a fact that neither the District Court nor the Court of Appeals found, the lesson was lost on all but the psychic Spectrum staffer.

## B

The Court's second excuse for deviating from precedent is the school's interest in shielding an impressionable high school audience from material whose substance is "unsuitable for immature audiences." *Ante*, at 271 (footnote omitted). Specifically, the majority decrees that we must afford educators authority to shield high school students from exposure to "potentially sensitive topics" (like "the particulars of teenage sexual activity") or unacceptable social viewpoints (like the advocacy of "irresponsible se[x] or conduct otherwise inconsistent with 'the shared values of a civilized social order' ") through school-sponsored student activities. *Ante*, at 272 (citation omitted).

*Tinker* teaches us that the state educator's undeniable, and undeniably vital, mandate to inculcate moral and political values is not a general warrant to act as "thought police" stifling discussion of all but state-approved topics and advocacy of all

but the official position.  See also *Epperson* v. *Arkansas*, 393 U. S. 97 (1968); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923). Otherwise educators could transform students into "closed-circuit recipients of only that which the State chooses to communicate," *Tinker*, 393 U. S., at 511, and cast a perverse and impermissible "pall of orthodoxy over the classroom," *Keyishian* v. *Board of Regents*, 385 U. S. 589, 603 (1967).  Thus, the State cannot constitutionally prohibit its high school students from recounting in the locker room "the particulars of [their] teen-age sexual activity," nor even from advocating "irresponsible se[x]" or other presumed abominations of "the shared values of a civilized social order."  Even in its capacity as educator the State may not assume an Orwellian "guardianship of the public mind," *Thomas* v. *Collins*, 323 U. S. 516, 545 (1945) (Jackson, J., concurring).

The mere fact of school sponsorship does not, as the Court suggests, license such thought control in the high school, whether through school suppression of disfavored viewpoints or through official assessment of topic sensitivity.[2]  The former would constitute unabashed and unconstitutional view-

---

[2] The Court quotes language in *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675 (1986), for the proposition that " '[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.' " *Ante*, at 267 (quoting 478 U. S., at 683).  As the discussion immediately preceding that quotation makes clear, however, the Court was referring only to the appropriateness of the *manner* in which the message is conveyed, not of the message's *content*. See, *e. g.*, *Fraser*, 478 U. S., at 683 ("[T]he 'fundamental values necessary to the maintenance of a democratic political system' disfavor the use of terms of debate highly offensive or highly threatening to others").  In fact, the *Fraser* Court coupled its first mention of "society's . . . interest in teaching students the boundaries of *socially appropriate behavior*," with an acknowledgment of "[t]he undoubted freedom to advocate unpopular and controversial views in schools and *classrooms*," *id.*, at 681 (emphasis added).  See also *id.*, at 689 (BRENNAN, J., concurring in judgment) ("Nor does this case involve an attempt by school officials to ban written materials they consider 'inappropriate' for high school students" (citation omitted)).

point discrimination, see *Board of Education* v. *Pico*, 457 U. S., at 878–879 (BLACKMUN, J., concurring in part and concurring in judgment), as well as an impermissible infringement of the students' "'right to receive information and ideas,'" *id.*, at 867 (plurality opinion) (citations omitted); see *First National Bank* v. *Bellotti*, 435 U. S. 765, 783 (1978).[3] Just as a school board may not purge its state-funded library of all books that "'offen[d] [its] social, political and moral tastes,'" 457 U. S., at 858–859 (plurality opinion) (citation omitted), school officials may not, out of like motivation, discriminatorily excise objectionable ideas from a student publication. The State's prerogative to dissolve the student newspaper entirely (or to limit its subject matter) no more entitles it to dictate which viewpoints students may express on its pages, than the State's prerogative to close down the schoolhouse entitles it to prohibit the nondisruptive expression of antiwar sentiment within its gates.

Official censorship of student speech on the ground that it addresses "potentially sensitive topics" is, for related reasons, equally impermissible. I would not begrudge an educator the authority to limit the substantive scope of a school-sponsored publication to a certain, objectively definable topic, such as literary criticism, school sports, or an overview of the school year. Unlike those determinate limitations, "potential topic sensitivity" is a vaporous nonstandard—like "'public welfare, peace, safety, health, decency, good order, morals or convenience,'" *Shuttlesworth* v. *Birmingham*, 394 U. S. 147, 150 (1969), or "'general welfare of citizens,'" *Staub* v. *Baxley*, 355 U. S. 313, 322 (1958)— that invites manipulation to achieve ends that cannot permissibly be achieved through blatant viewpoint discrimination and chills student speech to which school officials might not

---

[3] Petitioners themselves concede that "'[c]ontrol over access'" to Spectrum is permissible only if "'the distinctions drawn . . . are viewpoint neutral.'" Brief for Petitioners 32 (quoting *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.*, 473 U. S. 788, 806 (1985)).

object.  In part because of those dangers, this Court has consistently condemned any scheme allowing a state official boundless discretion in licensing speech from a particular forum.  See, *e. g.*, *Shuttlesworth* v. *Birmingham, supra,* at 150–151, and n. 2; *Cox* v. *Louisiana,* 379 U. S. 536, 557–558 (1965); *Staub* v. *Baxley, supra,* at 322–324.

The case before us aptly illustrates how readily school officials (and courts) can camouflage viewpoint discrimination as the "mere" protection of students from sensitive topics. Among the grounds that the Court advances to uphold the principal's censorship of one of the articles was the potential sensitivity of "teenage sexual activity."  *Ante,* at 272.  Yet the District Court specifically found that the principal "did not, as a matter of principle, oppose discussion of said topi[c] in *Spectrum.*"  607 F. Supp., at 1467.  That much is also clear from the same principal's approval of the "squeal law" article on the same page, dealing forthrightly with "teenage sexuality," "the use of contraceptives by teenagers," and "teenage pregnancy," App. 4–5.  If topic sensitivity were the true basis of the principal's decision, the two articles should have been equally objectionable.  It is much more likely that the objectionable article was objectionable because of the viewpoint it expressed: It might have been read (as the majority apparently does) to advocate "irresponsible sex." See *ante,* at 272.

### C

The sole concomitant of school sponsorship that might conceivably justify the distinction that the Court draws between sponsored and nonsponsored student expression is the risk "that the views of the individual speaker [might be] erroneously attributed to the school."  *Ante,* at 271.  Of course, the risk of erroneous attribution inheres in any student expression, including "personal expression" that, like the armbands in *Tinker,* "happens to occur on the school premises," *ante,* at 271.  Nevertheless, the majority is certainly correct that indicia of school sponsorship increase the likelihood

of such attribution, and that state educators may therefore have a legitimate interest in dissociating themselves from student speech.

But "'[e]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" *Keyishian* v. *Board of Regents*, 385 U. S., at 602 (quoting *Shelton* v. *Tucker*, 364 U. S. 479, 488 (1960)). Dissociative means short of censorship are available to the school. It could, for example, require the student activity to publish a disclaimer, such as the "Statement of Policy" that Spectrum published each school year announcing that "[a]ll . . . editorials appearing in this newspaper reflect the opinions of the *Spectrum* staff, which are not necessarily shared by the administrators or faculty of Hazelwood East," App. 26; or it could simply issue its own response clarifying the official position on the matter and explaining why the student position is wrong. Yet, without so much as acknowledging the less oppressive alternatives, the Court approves of brutal censorship.

## III

Since the censorship served no legitimate pedagogical purpose, it cannot by any stretch of the imagination have been designed to prevent "materia[l] disrup[tion of] classwork," *Tinker*, 393 U. S., at 513. Nor did the censorship fall within the category that *Tinker* described as necessary to prevent student expression from "inva[ding] the rights of others," *ibid.* If that term is to have any content, it must be limited to rights that are protected by law. "Any yardstick less exacting than [that] could result in school officials curtailing speech at the slightest fear of disturbance," 795 F. 2d, at 1376, a prospect that would be completely at odds with this Court's pronouncement that the "undifferentiated fear or apprehension of disturbance is not enough [even in the public school context] to overcome the right to freedom of expres-

sion." *Tinker, supra,* at 508. And, as the Court of Appeals correctly reasoned, whatever journalistic impropriety these articles may have contained, they could not conceivably be tortious, much less criminal. See 795 F. 2d, at 1375–1376.

Finally, even if the majority were correct that the principal could constitutionally have censored the objectionable material, I would emphatically object to the brutal manner in which he did so. Where "[t]he separation of legitimate from illegitimate speech calls for more sensitive tools" *Speiser* v. *Randall,* 357 U. S. 513, 525 (1958); see *Keyishian* v. *Board of Regents, supra,* at 602, the principal used a paper shredder. He objected to some material in two articles, but excised six entire articles. He did not so much as inquire into obvious alternatives, such as precise deletions or additions (one of which had already been made), rearranging the layout, or delaying publication. Such unthinking contempt for individual rights is intolerable from any state official. It is particularly insidious from one to whom the public entrusts the task of inculcating in its youth an appreciation for the cherished democratic liberties that our Constitution guarantees.

## IV

The Court opens its analysis in this case by purporting to reaffirm *Tinker*'s time-tested proposition that public school students "do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Ante,* at 266 (quoting *Tinker, supra,* at 506). That is an ironic introduction to an opinion that denudes high school students of much of the First Amendment protection that *Tinker* itself prescribed. Instead of "teach[ing] children to respect the diversity of ideas that is fundamental to the American system," *Board of Education* v. *Pico,* 457 U. S., at 880 (BLACKMUN, J., concurring in part and concurring in judgment), and "that our Constitution is a living reality, not parchment preserved under glass," *Shanley* v. *Northeast Independent School Dist., Bexar Cty., Tex.,* 462 F. 2d 960, 972 (CA5

1972), the Court today "teach[es] youth to discount important principles of our government as mere platitudes." *West Virginia Board of Education* v. *Barnette*, 319 U. S., at 637. The young men and women of Hazelwood East expected a civics lesson, but not the one the Court teaches them today.

I dissent.