Michael ROMANO, Plaintiff,

v.

Margaret R. HARRINGTON, Individually and as Principal of Port Richmond High School, the Board of Education of the City School District of the City of New York, et al., Defendants.

No. CV 85–2608.

United States District Court,
E.D. New York.

Nov. 29, 1989.

Paul Janis, New York State United Teachers, New York City, for plaintiff.

Diane Morgenroth, Lina Liberatore, New York City Corp. Counsel, New York City, for defendants.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

Plaintiff Michael Romano, a tenured English teacher at the Port Richmond (Staten Island) High School and former faculty advisor to the school's newspaper, *The Crow's Nest*, was fired from his position as advisor following the newspaper's publication of a student-written Op–Ed article opposing the then-proposed federal holiday for Martin Luther King, Jr. Plaintiff thereafter commenced this action under 42 U.S.C. § 1983 claiming that the termination violated the First and Fourteenth Amendments.

Before the Court is the second summary judgment motion of defendants Margaret Harrington (present principal of Port Richmond High School) and the New York City Board of Education. This Court denied defendants' previous motion for summary judgment, holding that plaintiff has third-party standing to assert a First Amendment claim and that several facts material

to plaintiff's due process claim are genuinely in dispute.[1]

On their present motion, defendants seek summary judgment on the First Amendment claim, relying principally on *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), where the Supreme Court described the parameters of First Amendment analysis in the context of high school student newspapers. Not surprisingly, the facts of *Hazelwood* do not mirror those at Port Richmond High; predictably, therefore, plaintiff emphasizes, and defendants minimize, the importance of the factual differences. The question for this Court is whether those differences are material. A detailed review of the *Hazelwood* decision is therefore required.

The *Hazelwood* majority began by reaffirming that "[s]tudents in the public schools do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" 108 S.Ct. at 567 (quoting *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969)), while recognizing that "[those rights] ... must be 'applied in light of the special characteristics of the school environment.'" 108 S.Ct. at 567 (quoting *Tinker*, 393 U.S. at 506, 89 S.Ct. at 736). Recognizing the school newspaper as one vehicle for student expression, the Court then described in detail the attributes of the East Hazelwood High publication, *Spectrum*. Two appear to have been dispositive. First, the paper was largely funded by the Board of Education and thus was "school sponsored," and second, the paper was an integral part of the course curriculum. 108 S.Ct. at 568–569.

By a five-to-three majority, the Court held that

educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.

108 S.Ct. at 571.[2]

Defendants argue that under *Hazelwood*, their alleged "editorial control" over the content of *The Crow's Nest* does not contravene the First Amendment because (i) *The Crow's Nest* is a school-sponsored activity (ii) which is part of the school's "curriculum," in a broad sense of the term, and (iii) preventing (or punishing) the publication of the controversial anti-King article was reasonably related to their legitimate pedagogical goal of minimizing tensions within an integrated student body that had experienced occasional racial conflicts.

In terms of funding by the respective Boards of Education, there is no question that *The Crow's Nest* is as much "school sponsored" as *Spectrum*. The real dispute focuses on the relationship of *The Crow's Nest* and *Spectrum* to the curriculum of their respective schools.

*Spectrum* was the product of a course, "Journalism II," taught during regular class hours at East Hazelwood High. The school's curriculum guide described Journalism II as a "laboratory situation in which the students publish the school newspaper applying skills they have learned in Journalism I." 108 S.Ct. at 568. The "faculty advisor" of *Spectrum* was the instructor of Journalism II. The only students who wrote for and edited *Spectrum* were those who elected to enroll in Journalism II, and publishing *Spectrum* was the primary coursework for these students. For their efforts, the Journalism II students received both academic credits as well as

---

1. This Court's earlier decision in this case, which includes a detailed discussion of the facts not repeated here, is reported at 664 F.Supp. 675 (E.D.N.Y.1987).

2. The Court also rejected the public forum claim, ruling that a high school newspaper could be considered a public forum "only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' ... or by some segment of the public, such as student organizations." 108 S.Ct. at 568 (citations omitted) The evidence in this case does not suggest the need for this Court to engage in public forum analysis, as plaintiff could not even make a colorable claim that *The Crow's Nest* was opened to indiscriminate use by the public.

the traditional feedback on student coursework, a grade.

*The Crow's Nest,* by contrast, is an extra-curricular activity at Port Richmond High. The student reporters, writers and editors of *The Crow's Nest* publish the paper in addition to a carrying a full courseload, receiving guidance, but not formal classroom instruction, from a faculty advisor. Although committed participants would undoubtedly welcome academic credits for their work, none is offered. Thus, critiques by fellow staff members, the faculty advisor, and readers—not grades— serve as feedback for *The Crow's Nest*'s student staff.[3]

Defendants attempt to minimize the importance of these differences in two ways. First they argue that the concept of curriculum for First Amendment purposes should not be limited to classroom endeavors *per se,* but should include the many so-called extra-curricular or co-curricular activities, such as student publications, through which the school furthers its educational mission. Defendants also contend that the important fact in *Hazelwood* was the school board's sponsorship of *Spectrum,* not the paper's link to the classroom, suggesting, therefore, that the extra-curricular nature of *The Crow's Nest* is immaterial. Defendants' arguments are fueled by dictum such as the following passage in the *Hazelwood* decision:

> The question whether the First Amendment requires a school to tolerate particular student speech ... is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive

to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

108 S.Ct. at 569–570.

To be sure, the passage does invite a broad interpretation of the term curriculum, and does suggest that educators' authority to control student expression may derive less from the fact that the particular forum is linked to the classroom than from the educators' sponsorship of an expressive activity for which there is some articulable pedagogical purpose. Nonetheless, for several reasons this Court is not persuaded that *Hazelwood* necessarily establishes, as a matter of law, that plaintiff's discharge as faculty advisor comports with the First Amendment.

First, and most important, because *Hazelwood* opens the door to significant curtailment of cherished First Amendment rights, this Court declines to read the decision with the breadth its dictum invites. Because educators may limit student expression in the name of pedagogy, courts must avoid enlarging the venues within which that rationale may legitimately obtain without a clear and precise directive. Thus, given the difference between the facts of *Hazelwood* and the present case, this Court cannot conclude that *Hazelwood* compels foreclosure of plaintiff's First Amendment claim.

Additionally, an earlier Supreme Court case, *Board of Education Island Trees v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion), suggests that the differences between *The Crow's Nest* and *Spectrum* are important. At issue in *Pico* was a school board's decision to remove from the junior high and high school libraries certain books it considered anti-American, anti-Semitic or ob-

---

**3.** This description reflects the status of *The Crow's Nest* at the time plaintiff was its faculty advisor. Today, publication of the paper is part

of a new journalism course at Port Richmond High School for which students receive academic credit.

scene. Like the *Hazelwood* majority, the *Pico* plurality first reiterated the now familiar principle that while the First Amendment protects student expression, the protection is in some degree lessened in the school environment because of its "special characteristics," 102 S.Ct. at 2909. The Court concluded that the "special characteristics of the school *library* (emphasis in original) make that environment especially appropriate for the recognition of the First Amendment rights of students." 102 S.Ct. at 2809. In particular, the Court explained:

> [The school board] emphasize[s] the inculcative function of secondary education, and argues that [it] must be allowed unfettered discretion to "transmit community values" through the Island Trees schools. But that sweeping claim overlooks the unique role of the school library. It appears from the record that use of the Island Trees school libraries is completely voluntary on the part of students. Their selection of books from these libraries is entirely a matter of free choice; the libraries afford them an opportunity at self-education and individual enrichment that is wholly optional. [The board] might well defend [its] claim of absolute discretion in matters of *curriculum* (emphasis in original) by reliance upon their duty to inculcate community values. But we think that [the Board]'s reliance upon that duty is misplaced, where, as here, [it] attempts to extend [its] claim ... *beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry* ... (emphasis added).

102 S.Ct. at 2809.

■ In this Court's view, *Pico* counsels against broadening *Hazelwood*'s reach. *Pico* explains that inroads on the First Amendment in the name of education are less warranted outside the confines of the classroom and its assignments. For example, pedagogic concerns allow educators to exercise more control over the content of students' required reading lists than over their voluntary, extra-curricular selections, even though the voluntary and required selections may exist side by side on the school library's shelf.[4] Similarly, educators may exercise greater editorial control over what students write for class than what they voluntarily submit to an extra-curricular, albeit school-funded, publication. In short, *Pico* indicates that some of the First Amendment freedoms retained at the schoolhouse gate may be shed at the classroom door. Unlike East Hazelwood's educators, defendants chose not to incorporate journalism into the formal curriculum as a subject of academic instruction. Unlike *Spectrum*'s the newsroom of *The Crow's Nest* is for this reason not a true classroom for First Amendment purposes. The speech and expression rights of Port Richmond High's journalists are therefore less limitable, in the name of education, than those of their East Hazelwood counterparts. How much less need not be decided today, as the fact of the difference is dispositive of defendants' motion.

■ Lastly, even if the *Hazelwood* dictum espoused by defendants and the broad reading it invites were controlling, summary judgment would be improper because facts material to the First Amendment claim are in dispute. For example, the *Hazelwood* Court's discussion of school sponsorship reflected a concern with whether the students' expression "might reasonably have been perceived to bear the imprimatur of the school." 108 S.Ct. at 569. In this case, the question of whether, at the time of the events in question, the contents of *The Crow's Nest* might reasonably be perceived to bear Port Richmond High's imprimatur is a genuine trial-worthy issue. *The Crow's Nest*'s masthead states that it does not express the views of the Board of Education, the school adminis-

---

**4.** The *Pico* plurality's discussion thus casts doubt on defendants' view that school-sponsorship was dispositive in *Hazelwood*. The Island Trees Board of Education unquestionably paid for the books on the schools' library shelves, but nothing in the *Pico* opinion suggests that school board funding—of either a library collection for student reading or a publication for student expression—might warrant curtailment of First Amendment rights in those fora.

tration or its faculty advisor.[5] Affidavits submitted by plaintiff and defendants indicate, however, that a genuine dispute exists as to whether the policy expressed in the masthead was in effect at the time of the events in question. Also in dispute is whether there existed an unofficial but regular practice of editorial review by the principal or school board. These being material facts genuinely in dispute, summary judgment must be denied. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## CONCLUSION

Defendants' motion for summary judgment is denied.

SO ORDERED.

---

5. The masthead of *The Crow's Nest* reads as follows:

   The student newspaper of P.R.H.S. the publication reflects student opinions and interests; the content and point of view are those of the editors and staff, and are not necessarily those of the BD. of ED., the school administration or its faculty advisor.
   The staff feels its primary purpose should be to inform rather than to hide, and to stimulate thinking.

   Students who are non-members of the staff are welcome to express their views in a letter to the editor or a point of view.
   All contributions are subject to restrictions of libel, defamation of character, slander and obscenity and must conform to general newspaper policies and copy style.
   Contributions may be rejected if considered unsuitable, or for such reasons as limited space, incomplete, unbalanced coverage, or unsigned.