Joseph DELCARPIO, et al.

v.

### ST. TAMMANY PARISH SCHOOL BOARD.

Civ. A. No. 93–531.

United States District Court, E.D. Louisiana.

Oct. 3, 1994.

---

James Robert Hashek, New Orleans, LA, for plaintiff Joseph and Kathryne Delcarpio, Individually and on behalf of minor children, Kathryne Ann Delcarpio and Thomas Joseph Delcarpio, James W. and Judith Y. Robertson, Individually and on behalf of minor child William J. Robertson, Jerry R. and Janet D. Bohannon, Individually and on behalf of minor child Brendan Bohannon.

Robert L. Hammonds, Kenneth F. Sills, Shelton Dennis Blunt, Hammonds & Sills, Baton Rouge, LA, for defendant St. Tammany Parish School Bd. through its president, A.R. Smith.

PATRICK E. CARR, District Judge.

This matter is before the Court on plaintiffs' motion for summary judgment. The Court considered the matter on the briefs. After considering the briefs, the law, and the evidence in the record, and for the reasons that follow, the Court now **GRANTS** the motion.

### BACKGROUND

This case involves the First Amendment implications of the St. Tammany Parish School Board's removal of the book *Voodoo & Hoodoo,* by Jim Haskins, from the schools' libraries. The book traces the development of tribal religion in Africa and describes its transfer to African American communities in America, including Louisiana. About 97 pages of the 218 page book is devoted to descriptions of common voodoo "spells" or practices, included to preserve the folklore and knowledge of the religious practices. Plaintiff (hereinafter P.) Ex. 1.[1]

---

1. The collection of the spells is divided into four categories: "To Do Ill", containing 61 spells; "To Do Good", containing 76 spells; "In Matters of Law", containing 26 spells; and "In Matters of Love", containing 60 spells. For example, two of the spells included in the category "To Do Ill" describe how to kill someone as follows:

Take a photograph of the intended victim and put it up on your wall. Shoot at it with an unloaded gun, cursing the person as you pull the trigger. Do this for three mornings and think evil thoughts of the person for the rest of the day. By the fourth day, he will be dead.

In early 1992, Mrs. Kathy Bonds discovered that the book, bearing a Clearwood Junior High Library stamp, had been concealed in her home. Mrs. Bonds traced the book to her daughter Tasha, who at that time was 13 and a 7th grade student at Clearwood. Mrs. Bonds objected to the book's content and telephoned the assistant principal at Clearwood to object to its presence in the school library. She also contacted a friend who was a member of the Slidell chapter of the Louisiana Christian Coalition, and gave the book to her.

The School Board had written policies and procedures in effect with respect to challenged library materials. P.Ex. 3. Pursuant to those procedures, Mrs. Bonds eventually filed a formal complaint with the school principal. The gist of her complaint was that she believed that children are "infatuated with the supernatural", and would attempt to enact the "spells" described in the book, which she believed to be potentially dangerous.[2] P.Ex. 4.

A "School–Level Committee for Reconsideration" first reviewed the book and the complaint. The school-level Committee unanimously recommended retaining the book in the reserve reference stacks at Clearwood, available only to 8th grade students with written parental permission. The Committee found that the book was educationally suitable and "fulfills the purpose for which it was selected, that is, to offer supplemental information/explanation to a topic included in the 8th grade Social Studies curriculum." P.Ex. 6.

An Appeals Committee, appointed by the Superintendent of St. Tammany Parish public schools, Mr. Terry Bankston, next reviewed the book and Mrs. Bonds' complaint. The Appeals Committee affirmed the School–Level Committee's findings and recommendation with one dissenting vote, that of Mr. Robert Womack, a member of the School Board. P.Ex. 9. Both committee reports pointed out that the book was not required reading. Mr. Womack prepared a Minority Report which was included in the Appeals Committee's report to the School Board.[3]

The matter was considered at the School Board meeting of June 11, 1992. Ms. Evodna Springer, chairperson of the Louisiana Christian Coalition (Slidell Chapter), requested and was granted time to speak at the meeting. She presented a petition circulated by the Louisiana Christian Coalition containing 1600 signatures, urging removal of *Voodoo & Hoodoo* from the public school libraries, and packets of information prepared by the Coalition. Plaintiffs' first motion for summary judgment, Ex. 13.

Prior to the vote on the matter, Dr. June Paul, Supervisor of Instruction, reported that the parish-wide Appeals Committee agreed with the School–Level Review Committee's recommendation that *Voodoo & Hoodoo* be placed in the Reserve Reference Collection to be used by students in 8th grade and above with written parental consent. She also advised that Superintendent Bankston concurred with the recommendation, and that Mr. Womack dissented. Transcript of meeting, P.Ex. 10.

Get a sock or stocking belonging to the intended victim. Put graveyard dirt in it and bury it under the victim's front steps. In three weeks the victim will be dead, having mysteriously withered away.

2. The most objectionable "spells" were those that provided for the use of weapons, curses, evil thoughts, killing animals (usually a black cat, chicken or a snake) and using its blood, using menstrual blood, pubic hair, human urine or excrement.

3. Mr. Womack's decision was as follows:
FINDINGS OF FACT: That the book promotes extremely unhealthy practices not conducive to sound moral value. This book does not promote solid thought processes as it relates to what we as educators are trying to accomplish in the classroom. At a time when there is a "resurgent" interest in the supernatural, we do not need books like "Voodoo & Hoodoo" in our libraries.
DECISION: I have determined that to allow this book to remain in our school libraries has no value whatsoever. We do not need "how to" manuals available to 8th graders or even seniors that deal with voodoo and the occult. Given the interest in the occult or the supernatural, students would definitely experiment with the "potions and hexes" outlined in this book over other sound educational reading material. I vote to eliminate the book from our school libraries.

The Board president recognized Mr. Womack, who then asked Dr. Paul's opinion of the book's content. Dr. Paul stated that she did not see any material value in any material that supports witchcraft, and that she chose "to agree with the word of God." *Id.* at pp. 13–14. Mr. Womack thereupon moved that *Voodoo & Hoodoo* be removed from all libraries in the St. Tammany Parish public school system. Dr. Allen seconded the motion. *Id.* at p. 14.

A substitute motion by Dr. Beisenherz to donate the book to the public libraries failed by a vote of 7–7. After some discussion, the 15 member St. Tammany Parish School Board voted 12–2, with one member absent, to remove *Voodoo & Hoodoo* from all public school libraries in the Parish. Rec. Vol. 1, Doc. 29, Ex. D, Minutes of the meeting.

Plaintiffs filed suit for declaratory and injunctive relief based on defendant's alleged violation of the free speech and establishment of religion provisions of the first amendment to the U.S. Constitution, and of the comparable provisions of the Louisiana Constitution, Art. 1, Sections 7 and 8.

## DISCUSSION

■ Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the Court must examine all evidence in a light most favorable to the nonmoving party. *Board of Education v. Pico,* 457 U.S. 853, 862–64, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982) (citation omitted).

The Court's analysis is guided by the Supreme Court's analysis in *Board of Education v. Pico. Id.* In *Pico,* the plaintiffs challenged a school board's removal of 9 books from school libraries, alleging that the books were removed because they contained passages that offended the social, political or moral taste of the board. A plurality of the Supreme Court recognized that local school boards must exercise their discretion in matters of education "in a manner that comports

with the transcendent imperatives of the First Amendment." *Id.* at 864, 102 S.Ct. at 2806–07. The *Pico* Court held

> that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia Board of Education v. Barnette,* 319 U.S. [624] at 642, 63 S.Ct. [1178] at 1187[, 87 L.Ed. 1628 (1943) ].

*Id.* at 872, 102 S.Ct. at 2810.

■ The Court defined the essential two part inquiry as whether the school board *intended* by their removal decision to deny students access to ideas with which the school board disagrees, and whether this intent was the decisive factor in the school board's decision. *Id.* The Court defined the term "decisive factor" as a "substantial factor" in the absence of which the opposite decision would have been reached. *Id.* at n. 22. If the answer to both parts of the inquiry is "yes", then the school board has exercised its discretion in violation of the Constitution. *Id.* at 870–72, 102 S.Ct. at 2810. However, a school board may remove books from the school library based on a decision that the books were pervasively vulgar or educationally unsuitable. *Id.*

### I.

The School Board contends first, that the decision does not violate the First Amendment because it was a curricular decision, and because the removal decision was based on the finding that the book was educationally unsuitable. Second, the School Board claims that the removal of *Voodoo & Hoodoo* can be considered a valid content-neutral regulation.

### A.

■ Public school boards have broad discretion when making curricular decisions. *See id.* at 862–64, 102 S.Ct. at 2806 (Brennan, J., plurality op.) *and* 880–82, 102 S.Ct. at 2815 (Blackmun, J. writing separately). The School Board claims that removal of *Voodoo*

*& Hoodoo* from the school library was a curricular decision because it was initially selected to offer supplemental information on, and for use as a reference in the study of a topic in the approved 8th grade social studies curriculum; it was stamped inside the back cover with "RESERVE; 8TH GRADE SOCIAL STUDIES"; and because students were required to attend library sessions under the direction of a faculty member pursuant to a "library skills" program that is incorporated into the curriculum in Parish schools.

The School Board cites *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) as expanding the concept of what constitutes school curriculum. That decision concerned a teacher's removal of two pages from a school-sponsored newspaper. The *Hazelwood* Court characterized such activities as school-sponsored publications and theatrical productions as part of the school curriculum when they are supervised by faculty members and are designed to impart particular knowledge or skills to students and audiences, because they might reasonably be perceived as bearing "the imprimatur of the school". *Id.* at 271, 108 S.Ct. at 570.

Both review committee reports stated that *Voodoo & Hoodoo* was not required reading for anyone pursuant to the social studies curriculum, but merely offered optional supplemental information relative to a topic included in the 8th grade social studies curriculum. The school stamp inside the book's cover did not make the reference book part of the required curriculum. Neither can the stamp be read as an official endorsement of the ideas contained in the book; it simply identified the general subject matter of the book as related to 8th grade social studies.

Moreover, there is no indication in the record that the required "library skills" program included a requirement that any student check out, or even seek out, any particular book while visiting the school library, much less the book *Voodoo & Hoodoo*. A student's mere presence in the library, even if required as part of a curricular activity and supervised by a faculty member, does not convert every book in the library to part of the required curriculum.

Board members Womack, Graves, and Allen stated at the Board meeting that they thought the book promoted the Voodoo religion and the practices it described. Other Board members voting to remove the book—Fielding, Lehman, Saurage, Tedesco, Verzwyvelt, and Young—stated in their depositions that they did not believe that the book advocates or encourages the practices that it describes, nor did they believe that allowing the book to remain in the reserve section of the library would lead students, or anyone else, to believe that the school or the Board approved or endorsed the practices described in the book. The School Board's decision to remove *Voodoo & Hoodoo* from all public school libraries can not be considered a curricular decision.

### B.

The School Board next contends that the Court should accept at face value the reason declared in the official minutes of the meeting as the Board's motive for its decision. The minutes, quoting Mr. Womack's motion, reflect that *Voodoo & Hoodoo* was removed because it offered no "sound basis for academic enrichment." *See* note 6, *infra.* Therefore, according to the Board, its determination that the book was educationally unsuitable renders its removal constitutional. The School Board further argues that because the subject of voodoo is still taught as part of the 8th grade social studies curriculum, the Board did not intend to deny students access to the ideas contained in *Voodoo & Hoodoo*.

*Voodoo & Hoodoo* was determined to be educationally unsuitable because either (1) it did not reflect the accepted religious or moral beliefs, or the values of the St. Tammany Parish community; or (2) that the ideas in the book were dangerous to students who would attempt to implement some of the voodoo practices the book describes.

### 1.

The initial complaint about the book[4], specifically concerned about "approximately 140

---

**4.** Mrs. Bonds complaint specified that she was

and the organized community opposition[5] to retaining the book in the school libraries, was based on the belief that the book promoted superstition, the occult, and the practices of the voodoo religion. Those ideas were objected to for religious reasons, or as being opposed to community values and mores.

While his motion to remove *Voodoo & Hoodoo* states that it offers no "sound basis for educational enrichment", the thrust of Mr. Womack's opposition to the book, as reflected in his dissent to the Appeals Committee decision and his exchange with Dr. Paul at the meeting[6], was his disapproval of the ideas contained in the book for moral reasons, and because he believed that those ideas did not reflect community values.

The statements of Dr. Allen and Mr. Graves at the meeting reflect opposition to

the ideas contained in the book based on religious beliefs. Dr. Allen, after he seconded Mr. Womack's motion, made the following statement:

> Ms. Springer said earlier that she didn't want to see a precedent set by removing this book, this how-to book on voodoo. But I feel that the precedent has already been set. If we go in that library we will not find a how-to book on Christianity. The Holy Bible is not there on the shelves.

P.Ex. 10. p. 15. Dr. Allen was immediately informed that the Bible was indeed in the library. Mr. Graves followed Dr. Allen's statement with the following:

> I had the same concern as Dr. Allen, because we have—there has been a lot of concern about the separation of church and

---

pages of ritualistic recipes". Her complaint listed 12 reasons for her objection to the book, 7 of which related directly to the spells. She also pointed out that the book was catalogued by the Library of Congress under "Voodooism", not history. The 10th point of her complaint states "[I]t tempts people to act on the negative emotions, for instance, cursing, hatred, desiring to kill, desiring to cause miscarriages and sicknesses. It promotes the use of weapons (guns and knives), fear, and superstition." *See* P.Ex. 4.

5. The only speaker to address the proposed removal of the book at the meeting was Ms. Evodna Springer, chairperson of the Slidell Chapter of the Louisiana Christian Coalition. She presented two items to the Board; a petition containing 1600 signatures urging removal of the book, and a handout prepared by the Coalition. The petition stated

> WE THE UNDERSIGNED BELIEVE
> THIS BOOK promotes cruelty to animals, unsanitary practices/health hazards, criminal flight to avoid prosecution and unsupervised handling of a firearm which may lead to criminal misuse as well as accidental shootings.
> THIS BOOK encourages revenge and hatred in dealing with interpersonal conflict.
> THIS BOOK is patently inappropriate for school children.

The handout included newspaper articles and court cases related to the use of voodoo and various other unusual religious rituals in criminal activity. Its position statement stated:

> Our objection to this book's accessibility to students in St. Tammany Parish Junior and Senior High Schools is based on our belief that the manner in which the subject matter is presented in the book constitutes an advocacy of the practices of the voodoo religious, which in many instances, encourage harmful, antisocial behavior.

6. The exchange was as follows:

Mr. Womack: I want to ask Dr. Paul a question and then I want to make a statement.

> Because I have great regard for Dr. Paul and the value that she represents to this school system and her opinions, I'd just like to ask you on a personal level how you feel about the book, Dr. Paul.

      \*    \*    \*    \*    \*    \*

Dr. Paul: I have read the report and the recommendation of the parish-level committee, which is also the recommendation of the superintendent, of which I am a member of the staff.

> My professional judgment, and this is very personal, is not separate from one nation under God or one person under God. And as a teacher and minister of God's word, I do not see any positive value in any material which supports the Witches of Endor nor the books at Ephesus. I choose to agree with the word of God. And this is a personal opinion.

Mr. Smith: Thank you.

Mr. Womack: Having said that, I want to make a statement, then, President Smith.

> Because I feel that the book offers no sound basis for academic enrichment, and because in our statement of beliefs in the—that we have in this very fine document that Dr. Brown just presented to us, the St. Tammany 2000, one of the statements in this document says that "The school must address the intellectual, physical, social, emotional and creative needs of students," I do not feel that this book propagates that in any manner whatsoever.
> Because of that, my recommendation is, and it is no motion at this time, that we remove the book from the shelves of all libraries in the St. Tammany Parish Public School System, and I so move.

state, and the one statement that I've heard most readily in the streets and some of the people that I've talked to is that, Is the Holy Bible on the shelves of our public schools?

Why, then, has the Gideons' been taken out of the schools? Because that has been—that's been my biggest problem, because we're not promoting a particular religion, and voodoo is a religious sector. It is recognized as a religion.

I have real bad problems when we teach our children, we put demonstrations on our shelves on how to kill. Whenever you find youngsters killing one another readily, without instructions, in the streets of New Orleans every day, I don't believe we need to teach it. We don't need books on our shelves that . . . teach them how to do this. They're doing enough without it.

P.Ex. 10, p. 16–17. Mr. Ward followed with a statement that he believed that the educational system:

should be a reflection of the mores, values of our society, St. Tammany Parish, how we feel . . . . .

As elected officials responsible to the people, the society we represent, we have to react to that. I respect our fine administration and their feelings about freedom of speech, but we have to be responsible to those people who we represent.

And I think I represent—I am a picture of those people I represent. And that book offends me, so therefore I would not vote to keep it in our library.

P.Ex. 10 pp. 27–28.

Those four Board members' decisions to remove the book were motivated by an impermissible intent to deny students access to the ideas contained in the book because those ideas did not comport with their values, concepts of morality, or religious beliefs.

### 2.

■ The remaining eight Board members stated in their depositions other motives for their vote to remove the book. All expressed a variety of reasons for their vote. However, the common theme was that the book was unsuitable for the age group at the school because of the concern for the safety of students who may try to implement the "spells" or voodoo practices described in the book, and that youngsters could not evaluate the "right and wrongs" or "good and bad" of the book. They determined that the book was educationally unsuitable for young children because they perceived that the ideas contained in the book may be dangerous to those children.

Excerpts from their depositions or comments at the meeting are quoted as follows.

Mr. Fielding: [T]he thing that really impressed me I guess was Betty's [Ms. Verzwyvelt] comments, "Eddie, I would be embarrassed to tell you some of the things in the book. You and I couldn't talk about some of the things that were in the book."

She is a teacher or was a teacher in our school system. So I respected her opinion. And then I got a copy of some of the material she had (pp. 10–11).

\* \* \* \* \* \*

And as I read through I was, you know, shocked at the graphicness of it all and just kind of the stupidity of it all as well (p. 11).

\* \* \* \* \* \*

This was just excerpts from the book, you know, pages from the book that she had herself underlined or looked at or highlighted . . . (p. 12).

\* \* \* \* \* \*

. . . its taking menstrual blood and pubic hairs and all these gross things and mixing them in some kind of potions. This was the kind of stuff that was in the book that to me had no educational value, and it was just opening ourselves up for some lawsuit because this child read the book and did some of the things and got sick (p. 13).

\* \* \* \* \* \*

It really had no educational value, and it promoted things that we as educators are not interested in promoting (p. 17).

\* \* \* \* \* \*

I looked at the book, and I mean, I saw it had no educational value. It was encouraging kids to do things that basically are against the law, and wouldn't—would not be of any real educational value (p. 34). P.Ex. 12.

Mr. Lehman: I have looked through the book and don't have a problem with the first half of the book. The second portion, I personally don't think it's suitable for children of a .tender age, as the phrase is sometimes used (pp. 48–49).

\* \* \* \* \* \*

I look through [the book] just for my own personal preferences and beliefs and so forth (p. 59).

\* \* \* \* \* \*

As far as being suitable for anyone—or a person of a certain age, that is a personal moral and ethical decision (p. 60).

\* \* \* \* \* \*

I did not read all of the recipes. I found them to be amusing, interesting. Some people with a weak stomach would find them repulsive. As far as educational suitability, I don't know. I guess it depends on what the student is researching (p. 61).

\* \* \* \* \* \*

There are some eighth graders who would probably not have a problem reading it. There are other eighth graders who I would be very concerned about them having the availability to look through it (p. 62).

\* \* \* \* \* \*

... I personally think that children will read something in a book and if it looks intriguing and interesting and they are able to try it, they will try it (p. 72). P.Ex. 13.

Mr. Saurage: If I see my constituency in the grocery store or around somewhere, I ask them how they feel about the tax. I've done that with *Hoodoo & Voodoo* (sic) also, discussed it in the supermarket. As I stated before, I'm not sure if the people I discussed it with read the book or not. But I catch them in the hardware store, supermarket, anywhere. I ask their opinion because that's the people I represent. ....

Q. (By Mr. Hashek) But [the response] was almost unanimous against the book?

A. (By Mr. Saurage) Yes. I can say that very comfortably. ....

Q. But the opinions you based your vote on, these were opinions that you had solicited from your constituents?

A. Yes (pp. 24–25).

\* \* \* \* \* \*

Q. Was there any consensus among your constituents as to why they were opposed to the book being on the shelf?

A. Yeah. The recipes in the book (p. 26).

\* \* \* \* \* \*

Q. Is it fair to say then that the, one and only factor in favor of your voting to remove the book is the opposition you perceived in your constituency?

A. I would like to rephrase it a little bit. The pulse of my people. That is the reason I voted the way I did.

Q. And you said this pulse of your people was basically against the book and the recipes in the book. Was there any pattern as to the discussion about the recipes?

A. Would they really work (p. 28). P.Ex. 14.

Mr. Smith: When I see that that has the recipes as I saw as how to do things, I just didn't feel it had any redeeming value, any value for our children, so I would say—if I had that information [the school-level committee report], good, but I could make a decision without it (p. 14).

\* \* \* \* \* \*

Q. (By Mr. Hashek) Is the nature of the recipes that your read before you took your vote, were those so offensive to you that you could not imagine any context in which a book as a whole containing those recipes might by suitable?

A. (By Mr. Smith) Right. I didn't think a book containing those type of recipes was suitable.

. . . .

I don't think those recipes would have been acceptable for any eighth grade child to perform..... I don't know that, but as an eighth grader, I don't think many times—eighth graders don't have the power to discern what is good or bad, or they want to do bad anyway. I felt denying access to it would help (pp. 17–18). P.Ex. 15.

Mr. Tedesco: Q. (By Mr. Hashek) On what factors did you base your decision to vote for removal of the book from public school libraries in St. Tammany?

A. (By Mr. Tedesco) The safety of having the book in our school library.

Q. So, the element of safety was the deciding factor in your vote?

A. It was very much a part of my decision, yes, sir.

. . . .

Q. What led you to believe that it would be unsafe for eighth-graders to look at the book, to read the book?

A. The content of the recipes.

Q. And at the time you took your vote, you had seen basically the recipes that were provided to you in the excerpts from Ms. Springer?

A. That's correct.

. . . .

When you have recipes that involve the handling of human excrement or menstrual blood, the violation of animals and so forth as contents in the recipes, with seventh- and eighth-graders that are very impressionable, to me that is safety. It's not academic, it's not religious; it's safety (pp. 23–25).

\*     \*     \*     \*     \*     \*

Q. But you were concerned that leaving the book in the library would constitute in some way some kind of endorsement by the Board?

A. It was a consideration. It was not my major consideration, but it was a consideration. Had that been the only reason for removing it, I would not have voted to remove it (p. 36). P.Ex. 16.

Ms. Verzwyvelt: Q. (Mr. Hashek) After you completed reading the book, what, if anything, did you do?

A. (By Ms. Verzwyvelt) It changed my mind. At first I did not, you know, I was opposed to censorship and had thought that, you know, the book would be permissible in a junior high library, elementary and junior high. But after reading the book, I decided that it was inappropriate.

Q. Based on what?

A. Based on it's mature sexual content. It's how to's for murder. The fact that the author had a disclaimer on it saying that this may be dangerous to one's safety and health to try the recipes.

Q. Anything else?

A. No (pp. 24–25).

\*     \*     \*     \*     \*     \*

Q. Do you recall whether you prepared any information for other board members regarding the book?

A. I copied about three pages of excerpts from it with the explicit sexual language and mature content because not all board members had been able to get a copy of the book.

Q. Do you remember haw many board members you provided with copies of excerpts, or did you provide them for everybody?

A. No, I didn't provide any. I just had a copy that probably two board members looked at. I don't really recall. Two or three, whoever asked me if I had read the book and wanted to know something about the book (pp. 29–30).

\*     \*     \*     \*     \*     \*

Q. Was it your thinking that leaving the book on the shelf even with restricted access would somehow be an endorsement from the board of the content of the book?

A. My only concern with leaving it with restriction was that a child could get it and then pass it around to his friends, and I felt it was not appropriate material for their maturity level. And so I felt that it would be better not to make it available to them. I would not want to take the responsibility for making it available to them (p. 44).

\* \* \* \* \* \*

Q. Is what the book describes offensive to you?

A. Are the recipes offensive? Yes.

Q. Anything in the book?

A. The recipes are. Some of them are. Many of them are, yes.

Q. Did that play a part in your decision to vote for removal?

A. Offensive meaning appropriate to the children. That's what I am talking about offensive. So that is why I voted to remove it because I felt that the material was not appropriate to their maturity, you know. The sexual content was not appropriate to their maturity, and so that was my concern (p. 45). P.Ex. 17.

Mr. Williams: I'm not for censorship. I don't like censorship. What concerned me, as I stated, was the parts of the book that contained the recipes and might endanger the students if they tried them. That was my consideration (p. 20).

\* \* \* \* \* \*

Q. (By Mr. Hashek) But the nature of the recipes was such that that outweighed any value you have perceived from the book?

A. That's it, exactly.

Q. Let me ask you some more about that. In a case like this, would the subject matter—you read all the recipes?

A. Yes, I did. I don't recall all of them, but I read all of them. In fact, I found some of them entertaining, amusing, and some of them disgusting. . . . .

Q. Is the subject matter of the recipes such that its so inappropriate for junior high students that no matter what the context, any publication containing that information would be, as a whole, inappropriate?

A. I think it would be inappropriate simply because I was afraid what effect it would have on a younger person's mind. As an older person, I can read anything and appreciate its value or non-value or whatever, but with the problems we have with this occult, you know, some young people turn to that, and I didn't want to see that kind of material in their hands (pp. 21–22).

\* \* \* \* \* \*

Q. Did you believe that leaving the book on the shelf would be an endorsement by the board of what is described in the book?

A. Yes, I did.

Q. Did you think when you took your vote then that it was important to send a message that the board did not endorse what was in the book?

A. That's right. . . . .

Q. Is what the book describes offensive to you?

A. The recipes, yes. Some were hilarious. Some were actually disgusting (p. 29). P.Ex. 18.

Ms. Young: You know, the question I asked myself was, is this the only book that could give additional information on voodoo. I certainly question—and I have a program at the office which does a readability scan on material, and I certainly questioned the appropriateness of that book at that level. I took a couple of pages and did a readability on it and I was really concerned because that determined that the book was not at all in the correct grade range, that, in fact, its readability was twelve plus (p. 26).

\* \* \* \* \* \*

When I went into that meeting I understood that this was a fourth grade student; that, in fact, the book was on the shelf; in fact, the book was in the reserved section under parental consent only; and that, in fact, this fourth grade child had gotten the book from the re-

served section without parental consent..... I did not see how putting it back in the same condition I understood it to be in would have helped (p. 33).

* * * * * *

Q. (By Mr. Hashek) Do you believe or did you believe on June 11th, 1992, that the recipe section of the book would be dangerous to eighth graders?

A. (By Ms. Young) I believe that that section of the book would be dangerous for anyone.

Q. Dangerous in what sense?

A. That the directions—That the material gave very graphic and very specific directions to accomplish specific goals.

Q. Have you concluded that there is a likelihood that somebody would, in fact, attempt any of these recipes?

A. Yes (pp. 38–39). P.Ex. 19.

Thus, the majority of Board members voted to remove the book in order to deny students access to ideas that the Board members deemed to be offensive, inappropriate, or dangerous.

First, the Board voted to remove the book from all public school libraries. The decision was not restricted to the younger students whose safety the Board purported to be concerned with, but affected all students in both junior and senior high schools. Second, at least six of the Board members had not read the entire book, but had read only excerpts supplied by Ms. Verzwyvelt (who testified that she had read the entire book), or by Ms. Springer, representing the Louisiana Christian Coalition. Finally, nothing in the record suggests that any incident had occurred in which a student attempted to implement any of the "recipes" in *Voodoo & Hoodoo* during the nearly two years that the book was in the library. None of the Board members stated that they had heard of any such incident.

Moreover, the 5th Circuit has refused to distinguish "dangerous" ideas from other

ideas contained in otherwise protected speech. In *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017 (5th Cir.1987), a parent attempted to hold a magazine publisher liable for the death of a 14 year old boy who had apparently tried to implement the practice of autoerotic asphyxia that was described in a magazine article. The Court reasoned as follows:

> [T]he supreme Court generally has not attempted to differentiate between categories of protected speech for the purposes of deciding how much constitutional protection is required. Such an endeavor would not only be hopelessly complicated but would raise substantial concern that the worthiness of speech might be judged by majoritarian notions of political and social propriety and morality. If the shield of the first amendment can be eliminated by proving after publication that an article discussing a dangerous idea negligently helped bring about a real injury simply because the idea can be identified as "bad," all free speech becomes threatened.

*Id.* at 1024 (internal citations omitted). *See also Video Software Dealers Association v. Webster*, 968 F.2d 684, 688 (8th Cir.1992) ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975)).[7]

### C.

■ While the School Board states that its removal decision was premised on the determination that the book was educationally unsuitable, its opposition brief argues that the book might also be considered pervasively vulgar, therefore its removal was constitutionally permissible. Of the 218 page book, only 15 to 20 pages contained the "spells" that the Board found objectionable. Along

---

**7.** Both of these cases dealt with the nearly unrestricted freedom of the press (in its broadest sense) to disseminate ideas to the public at large, i.e. the "marketplace of ideas", even if those ideas may be potentially dangerous to some individuals who receive them. Limited categories of speech or expression are not constitutionally protected from prior restraint: obscene material, fighting words, defamatory material, publication constituting an invasion of privacy, or publication likely to incite imminent lawless action. *See Herceg* at 1019–20.

with the expressed concerns that the ideas in the book may be dangerous, some Board members objected to references to semen, menstrual blood, pubic hair, urine and excrement in those spells. Ms. Verzwyvelt stated in her deposition that she decided that the book was inappropriate in part because of its "mature sexual content". P.Ex. 17 pp. 24–25. However, there was no suggestion at the time of the vote, and none in the record before the Court, that the book was removed based on a determination that it was pervasively vulgar.

## II.

While the School Board acknowledges that the decision to remove *Voodoo & Hoodoo* from the school libraries was content-based, it claims that the decision can be classified as content-neutral regulation warranting a balancing of the government's interest against the individual's interest in the proscribed communication. The Board contends that the book's removal furthered the School Board's interest in protecting students and providing a safe educational environment. Opposition Memo, p. 25, 29.

The balancing test to judge the constitutionality of regulation of protected speech requires a finding that the regulatory measure is (1) content neutral; (2) serves a substantial public interest; (3) is narrowly written; and (4) leaves open alternative channels of communication. *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 648–55, 101 S.Ct. 2559, 2564–67, 69 L.Ed.2d 298 (1981). The Board's removal of the book was clearly based on its content. It would not have been removed if it did not contain the descriptions of the spells. There is nothing in the record to suggest that the book caused any disruption at the school, or that any students had been injured, or had injured anyone else, trying to implement the spells. The restriction is not narrowly tailored to further the School Board's stated interests because those interests could have been addressed by restricting the book to the reserve section of the library, accessible only to 8th graders with written parental permission, or even by restricting the book to the senior high school libraries.

Finally, while there may be other information on voodoo available to interested students, the specific information on voodoo practices contained in *Voodoo & Hoodoo* was not otherwise available within the school environment. It was that specific information the Board sought to deny to the students. The removal of the book was not valid content-neutral regulation.

## III.

The plaintiffs' complaint alleges that the School Board's action violated Article 1, §§ 7 and 8 of the Louisiana constitution. Their arguments in support of the motion for summary judgment specifically address only the federal constitutional claims. However, when state constitutional provisions mirror the similar provisions in the federal constitution, a federal court need not, indeed, should not abstain from deciding the issue in favor of adjudication of the claim in a state forum. *See Guiney v. Roache,* 833 F.2d 1079, 1082 (1st Cir.1987) ("This doctrine of abstention has its corollary in the rule that 'abstention is not required for interpretation of parallel state constitutional provisions.' " (citing *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 237 n. 4, 104 S.Ct. 2321, 2327 n. 4, 81 L.Ed.2d 186 (1984)); *Pue v. Sillas,* 632 F.2d 74, 81 and n. 6 (9th Cir.1980).

Moreover, under Louisiana jurisprudence, judicial determination of a claim brought pursuant to the parallel sections of the federal constitution is applicable to Article 1, sections 7 and 8 of the state constitution. *State v. Franzone,* 384 So.2d 409, 411 (La.1980) (The state constitution's guarantee of freedom of the press and of expression was designed to serve the same purpose as the same guarantee in the federal constitution, and provides at least coextensive protection.); *Opinion of the Attorney General,* No. 75–1731, Jan. 9, 1976 (Because the language of La. Const. Art. 1, § 8 is virtually identical to the parallel provision in the federal constitution, the two constitutional provisions should be interpreted in a like manner, and decisions of the United States Supreme Court construing the establishment clause of the first amendment are applicable to determining limitations imposed by legislative ac-

tions by this provision of the state constitution.) Therefore, the Court's decision on this motion for summary judgment determines plaintiffs' state constitutional claims as well as the federal constitutional claims.

## IV.

Considering the evidence in the light most favorable to the School Board, the record in this matter discloses that there is no genuine issue of material fact in dispute. By removing *Voodoo & Hoodoo* from all public school libraries in St. Tammany Parish, the School Board intended to deny students access to the objectionable ideas contained in the book, particularly the descriptions of voodoo practices and religious beliefs. The Board's disapproval of those ideas, and its perception that the ideas may be dangerous, was the decisive factor in the Board's decision to remove the book. The petitioners are entitled to judgment as a matter of law. Accordingly;

**IT IS ORDERED** that plaintiffs' motion for summary judgment be and is hereby **GRANTED;** reserving to plaintiffs the right to apply for reasonable attorney's fees pursuant to 42 U.S.C. § 1988.