**C.H. as guardian ad litem of Z.H., a minor, and C.H. individually, Plaintiffs,**

v.

**Grace OLIVA, Gail Pratt, Patrick Johnson, Medford Township Board of Education, Leo F. Klagholtz, Commissioner of Education, the State of New Jersey Department of Education, Defendants.**

Civil Action No. 96–2768.

United States District Court, D. New Jersey.

Dec. 30, 1997.

F. Michael Daily, Jr., Quinlan, Dunne & Daily, Merchantville, NJ, for Plaintiffs.

Betsy G. Liebman, Mitchell A. Altschuler, Capehart & Scatchard, Mount Laurel, NJ, for Defendants Medford Twp. Bd. of Ed., Oliva, Pratt, and Johnson as to Plantiff's Personal Injury Claims.

John G. Dyer, Medford, NJ, Michael Paul Madden, Madden, Madden & DelDuca, Haddonfield, NJ, for Defendants Oliva, Pratt and Johnson.

John K. Worthington, Deputy Attorney General, Office of the Attorney General, Trenton, NJ, for Defendants New Jersey Dept. of Educ., Leo Klagholz, Com'r, New Jersey Dept. of Educ.

### OPINION

RODRIGUEZ, District Judge.

This matter is before the court on motions of (1) defendants Medford Township Board of Education, Grace Oliva, Gail Pratt, and Patrick Johnson (the "Medford defendants"), and (2) defendants State of New Jersey Department of Education and Leo Klagholz, Commissioner of the State of New Jersey Department of Education (the "State defendants"), for judgment on the pleadings pursuant to FED.R.CIV.P. 12(c). The court, having considered the submissions of the parties, and for the reasons set forth below, grants the motions and dismisses the complaint.[1]

### BACKGROUND

The basic facts are not in dispute. Prior to February 23, 1996, Z.H. was a student at Haines Elementary School, which is one of defendant Medford Township Board of Education's public schools. While Z.H. was in kindergarten in 1994, students in his class were asked to make posters depicting things for which they were thankful. Z.H.'s poster professed his thanks for "Jesus." All the posters were then placed on display in the school hallway. Apparently, while the regular classroom teacher was absent, some unknown person removed Z.H.'s poster due to its religious theme. Upon the classroom teacher's return, the poster was returned to display, albeit in a less prominent location than it had previously occupied.

A similar incident occurred in February 1996 while Z.H. attended defendant Grace Oliva's first grade class at Haines Elementary. Ms. Oliva maintained a policy in her class which rewarded students reaching a certain level of reading proficiency by allowing them to read a book of their own choosing to the rest of the class.[2] On February 9, 1996, Z.H. chose to read a story called "A Big Family," an adaptation of chapters 29–33 of the Book of Genesis, from a book entitled "The Beginner's Bible." [3] *See Genesis* 29:1–

---

**1.** It appears from the submissions of the parties that plaintiffs have served the defendants with a proposed amended complaint. However, plaintiffs have neither filed this amended complaint nor moved for leave to file it. Accordingly, the initial complaint will be entertained in the disposition of these motions.

**2.** The material was subject to review by Ms. Oliva to ensure that it would be suitable in length

and complexity for first grade students. Compl. at ¶ 17.

**3.** The story "A Big Family" reads:
Jacob traveled far away to his uncle's house. He worked for his uncle, taking care of sheep. While he was there, Jacob got married. He had twelve sons. Jacob's big family lived on his uncle's land for many years. But Jacob wanted to go back home. One day, Jacob

33:20. However, because of its religious content, Ms. Oliva did not allow Z.H. to read the story to the class. Instead, although the other students were allowed to read their non-religious stories to the class, he was only allowed to read the story to Ms. Oliva.

After C.H., Z.H.'s mother, was notified that the story was inappropriate, she made both informal and formal demands of the various Medford defendants that Z.H. be allowed to read the story to the entire class.[4] These demands were not satisfied. Accordingly, on June 5, 1996, plaintiffs instituted the present action, alleging, in a two count complaint, that (1) the actions of the Medford defendants willfully and intentionally violated Z.H.'s rights to Freedom of Expression under the First Amendment and 42 U.S.C. § 1983, and (2) the State defendants, by failing to either exercise their supervisory powers or implement a policy to allow for expression of religious beliefs in the classroom, aided in this violation. The complaint seeks both monetary and injunctive relief. The State and Medford defendants answered the complaint, and on April 9, 1997 and April 10, 1997 respectively, moved for judgment on the pleadings,[5] raising several independent reasons why the complaint, in its entirety, should be dismissed. These motions are presently before the court.

### DISCUSSION

#### A. Standard for Judgment on the Pleadings

█ Motions for judgment on the pleadings under FED.R.CIV.P. 12(c) are treated similar to motions to dismiss filed pursuant to FED.R.CIV.P. 12(b)(6)—judgment will not be entered unless the moving party establishes that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Society Hill Civic Association v. Harris*, 632 F.2d 1045, 1054 (3d Cir. 1980) (citing WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1368 at 690 (1969)). In considering the motion, the court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in a light most favorable to the nonmoving party." *Id.*

#### B. Threshold Issues

Prior to reaching the merits of plaintiffs' claims, the State defendants offer several bases for dismissal of the complaint, the majority of which were not addressed by plaintiffs in opposition. Nonetheless, each will be considered in turn.

#### 1. Eleventh Amendment Immunity to Suit

█ First, the State defendants argue that the Eleventh Amendment bars plaintiffs' claims against them. That Amendment reads:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. This Amendment has consistently been interpreted to prohibit federal courts from hearing suits brought by citizens against their own state. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984) (citing *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Although a party seeking to recover money damages from the state treasury is precluded from obtaining federal jurisdiction over a state without its consent to suit,[6] *Edelman v.*

---

packed up all his animals and his family and everything he had. They traveled all the way back to where Esau lived. Now Jacob was afraid that Esau might still be angry at him. So he sent presents to Esau. He sent servants who said, "Please don't be angry anymore." But Esau wasn't angry. He ran to Jacob. He hugged and kissed him. He was happy to see his brother again.

4. These demands included issuance of formal apologies to both Z.H. and C.H.

5. The State defendants filed a motion to dismiss the amended complaint, or, in the alternative, for summary judgment.

6. The immunity from suit also extends to "agencies or departments" of the state. *Pennhurst*, 465 U.S. at 100, 104 S.Ct. at 908 ("It is clear, of course, that in the absence of consent, a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). Such "agencies or

*Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the amendment's bar does not apply when a plaintiff is seeking prospective injunctive relief from state officials violating federal law.[7] *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Pennhurst,* 465 U.S. at 102–03, 104 S.Ct. at 909.

 Here, plaintiffs' only claim against the State defendants is contained in Count Two of the complaint which seeks prospective injunctive relief.[8] No claim for monetary damages is made against either the Department of Education or Commissioner Klagholz for the alleged failure to exercise supervisory powers and enact policies which would protect the constitutional rights of children such as Z.H. However, although N.J.Stat.Ann. § 52:4A–1 acts as a waiver of sovereign immunity for constitutional violations in state court,[9] it does not constitute consent to suit in the federal courts. *Kennecott Copper Corp. v. State Tax Commission,* 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946). Therefore, although the Eleventh Amendment does not bar plaintiffs' action against Commissioner Klagholz, it does bar the claims against the State Department of Education.

### 2. Political Question Doctrine and Separation of Powers

 The State defendants claim that the plaintiffs' lawsuit comprises a nonjusticiable political question and implicates the separation of powers doctrine. They argue that

only the United States Department of Education and the executive branch of government have the authority to grant the plaintiffs the relief they request. Therefore, any federal judicial intervention in matters that have been traditionally relegated to the executive branch and state and local authorities would be improper.

To the extent the defendants argue that the federal courts cannot compel the state to adopt general educational policies, they are correct. However, when the complaint is viewed in the light most favorable to the plaintiffs, their claim for relief can be construed as a demand for the State defendants to cease their wrongful behavior and adhere to constitutional principles.[10] This certainly goes beyond a simple request to adopt basic policies. In this light, the plaintiff's claim falls within this court's jurisdiction. The Third Circuit, commenting on the scope of the political question doctrine, has stated that "while it is not the role of the courts to disturb policy decisions of the political branches, the question of whether an agency has acted in accordance with a statute is appropriate for judicial review." *Specter v. Garrett,* 971 F.2d 936, 954 (3d Cir.1992). This axiom naturally applies when the issue concerns whether an agency has complied with the Constitution. Thus, the plaintiffs' claims are not barred from consideration.

### 3. Standing

 The State defendants argue that plaintiffs lack standing to bring this action.

---

departments" of the State of New Jersey include its Department of Education. *See* N.J.Stat.Ann. § 18A:4–1.

7. 42 U.S.C. § 1983 does not act as a general waiver of immunity that allows states to be sued in federal court. Therefore, in an action for monetary damages brought under § 1983, a state's consent to suit is still required before jurisdiction can attach. *See Edelman,* 415 U.S. at 651, 94 S.Ct. at 1347, 39 L.Ed.2d at 662. Nonetheless, under *Ex Parte Young,* state officials may be sued under § 1983 for prospective injunctive relief. *Ex parte Young,* 209 U.S. at 123, 28 S.Ct. at 441, 52 L.Ed. at 714.

In addition, counties and municipalities, although considered "persons acting under color of state law" under § 1983, are not considered part of the state for purposes of Eleventh Amendment immunity. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d

611 (1978). Therefore, actions for both injunctive relief and monetary damages may be brought against these entities.

8. The sufficiency of that relief is immaterial to Eleventh Amendment analysis and will be considered below.

9. N.J.Stat.Ann. § 52:4A–1 states:

Actions on Tort against state.
Except for actions founded upon the Constitution of this state or the United States or an express provision of the statutory laws of this State, no action shall be instituted or continued against the State or any department or other agency thereof for the recovery of money damages, based on tort, where the cause of action accrues prior to July 1, 1972.

10. The propriety of the plaintiffs' claim for injunctive relief will be discussed below.

Standing in an Article III court can only be obtained by a plaintiff who files a complaint that demonstrates compliance with both constitutional and prudential requirements. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). To meet the constitutional requirements, a party must "'show that [they] personally ha[ve] suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' ... and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision[.]' " *Id.* at 472, 102 S.Ct. at 758 (citations omitted). Prudential principles also require that the plaintiff assert his own legal rights, the grievance be specific to plaintiff and not generalized, and the complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 474–75, 102 S.Ct. at 760 (citing *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (footnote omitted)).

C.H. has instituted this action in both her capacity as guardian *ad litem* of Z.H., and in an individual capacity. However, the right asserted against and relief requested from Commissioner Klagholz—adoption of policy to prevent future violations of students' constitutional rights—is not her own. As a result, C.H. does have standing to proceed with the suit against Commissioner Klagholz in her capacity as Z.H.'s guardian *ad litem*, but not in an individual capacity.

### 4. *Abstention Doctrine*

■ The State defendants urge this court to abstain from hearing the claims brought against them. Under the doctrine announced in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), federal courts, based upon principles of comity, are required to abstain from hearing actions similar to those filed in state courts "in which

important state interests are implicated, so long as the federal claimant has an opportunity to raise any constitutional claims [in the state proceeding.]" *O'Neill v. City of Philadelphia,* 32 F.3d 785, 789 (3d Cir.1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1355, 131 L.Ed.2d 213 (1995); *see also Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (applying *Younger* in the civil context); *Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (applying *Younger* to administrative proceedings).

■ A party arguing in favor of *Younger* abstention must show: (1) that there are ongoing state judicial-type proceedings involving the federal claimant; (2) which implicate important state interests; and (3) which provide an adequate opportunity to present the federal claims. *Middlesex County,* 457 U.S. at 432, 102 S.Ct. at 2521. However, parallel actions may nonetheless be maintained "so long as the plaintiff does not seek relief in the federal court that would interfere with the state judicial process." *Marks v. Stinson,* 19 F.3d 873, 885 (3d Cir. 1994), *cert. denied,* 513 U.S. 1111, 115 S.Ct. 901, 130 L.Ed.2d 785 (1995). In these circumstances, "the principles of comity underlying *Younger* abstention are not implicated." *Gwynedd Properties, Inc. v. Lower Gwynedd Township,* 970 F.2d 1195, 1201 (3d Cir.1992).

The State defendants argue that the complaint should be dismissed because plaintiffs have a state administrative avenue available to seek redress, and because it is clear that the complaint implicates important state interests (plaintiffs are seeking the statewide adoption of policies which would allow the reading of secular-based materials in the public schools). However, there are no ongoing judicial-type proceedings which would implicate the principles of comity necessary for abstention under *Younger.* Contrary to the State defendant's assertion, the mere ability of a plaintiff to seek redress in an alternative forum is not sufficient.[11]

---

11. In arguing that the existence of an available state proceeding may be interpreted as a "parallel action" for *Younger* purposes, the State defendants cite *O'Neill v. City of Philadelphia,* 32 F.3d

785, 790–91 (3d Cir.1994). That interpretation, however, goes well beyond the principles articulated in that case. *O'Neill* concerned a situation where the plaintiffs failed to seek judicial review

▆▆▆ Under the doctrine announced in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943),

> [w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Public Service, Inc. v. Council of City of New Orleans, (NOPSI )*, 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989). "The core of the *Burford* abstention doctrine ... is that federal courts should avoid needless disruption of an important and complex state regulatory scheme." *Lac D'Amiante du Quebec v. American Home Assurance Co.*, 864 F.2d 1033, 1038 (3d Cir. 1988); *see also United Services Automobile Association v. Muir*, 792 F.2d 356, 364 (3d Cir.1986) ("Generally, *Burford* abstention is justified where a complex regulatory scheme is administered by a specialized state tribunal having exclusive jurisdiction."), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987). *Burford* abstention is inapplicable in cases where such a regulatory scheme is lacking. *See Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 534–35 (3d Cir.1988); *Muir*, 792 F.2d at 365.

▆▆▆ The State defendants claim that the system of public education in New Jersey is "a highly regulated and complex administrative system" that would necessitate abstention under *Burford*. State Defs.' Br. at 24. However, while the Department of Education is a state-run system, the defendants have failed to show how it qualifies as a complex regulatory scheme. Significantly, the scenarios to which *Burford* normally applies concern far more complicated administrative and regulatory systems. *See, e.g., General Glass Industries Corp. v. Monsour Medical Foundation*, 973 F.2d 197, 201 (3d Cir.1992) ("Pennsylvania has expressed its strong state interest in regulating insurance companies [liquidation procedures] through a complex regulatory scheme, known as the Insurance Department Act"); *Lac D'Amiante du Quebec*, 864 F.2d at 1045 (holding that New York's regulation of insolvent insurance companies was a "detailed, complex scheme"); *but see Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 534 (3d Cir.1988) (holding that Committee on Attorney Advertising that was reviewed by New Jersey Supreme Court did not present the "complex, technical, regulatory scheme to which the Burford abstention doctrine usually is applied.").[12]

▆▆▆ It is significant that the schemes that have traditionally compelled abstention under *Burford*, which were created and administered by complex statutes, are noticeably different from New Jersey's public school system. Moreover, "while *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or

---

of unfavorable state administrative determinations so they could sooner file suit in federal court. *Id.* The Third Circuit held this to be an improper maneuver to slip into federal court, and thus found that the prior case was still "pending," compelling abstention. The instant case, in contrast, gives no indication that the plaintiffs have "chosen not to pursue their state-court judicial remedies, but have instead sought to invalidate the State's judgment by filing a federal action." *Id.* at 791. Consequently, because there are no pending state cases here, abstention under *Younger* is not appropriate.

12. In *Felmeister*, the court found that the New Jersey committee was significantly different from the regulatory scheme in *Burford*. The

court noted that "the regulation of attorney advertising, unlike the regulation of oil and gas conservation involved in *Burford*, does not involve peculiarly local conditions, is not beyond the understanding of a federal court, and does not require special or technical expertise or interpretation of numerous other state regulations." *Felmeister*, 856 F.2d at 534; *see United Services Automobile Association v. Muir*, 792 F.2d 356, 364–65 (3d Cir.1986). While the New Jersey public school system may involve "peculiarly" local conditions, it is not beyond the understanding of the federal court and does not require special or technical expertise or interpretations.

even in all cases where there is a 'potential for conflict with state regulatory law or policy.'" *Motor Club of America v. Weatherford,* 841 F.Supp. 610 (D.N.J.1994) (quoting *NOPSI,* 491 U.S. 350, 362, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)). For the above reasons, abstention under *Burford* is inappropriate.

### 5. *Ripeness*

 Finally, the State defendants argue that plaintiffs' claims are not ripe for judicial review. According to the State defendants, the claim for relief is not appropriate for review as it "is unquestionably based on a contingency, because the federal claims they seek to assert arise only if it is determined that students have the right to present religious views in school assignments, and adoption of a rule or policy by the State defendants guaranteeing this right is necessary."[13] State Defs.' Br. at 25. They claim that this contingency renders the plaintiffs' potential remedy too remote and therefore beyond this court's jurisdiction.

 "Ripeness prevents courts from 'entangling themselves in abstract disagreements.'" *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1462 (3d Cir.1994), *cert. denied,* ── U.S. ──, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977), and *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983)). "A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.....'" *Presbytery of New Jersey,* 40 F.3d at 1463 (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citation omitted)). Thus, the inquiry focuses on whether the plaintiffs have suffered some type of cognizable harm from the defendants' actions.

In this case, the plaintiffs have sufficiently alleged an injury capable of redress. They assert that the policies and actions of the defendants have detrimentally affected them, and not that there exists the potential for future harm. Unlike *Armstrong World Industries, Inc. v. Adams,* 961 F.2d 405 (3d Cir.1992)[14] and *Presbytery of New Jersey,* where the plaintiffs sought a declaratory judgment and/or an injunction against a statute not yet enforced, the plaintiffs here have sought redress as a result of the enforcement of allegedly unconstitutional policies and procedures. Consequently, the plaintiffs' claim will not be dismissed as unripe.

### C. *Merits of the Claims*

#### 1. *Failure to State a Claim Under § 1983*

 The State defendants first argue that the complaint should be dismissed because it does not state a claim under 42 U.S.C. § 1983. That section provides, in pertinent part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in

---

13. The State defendants also argue that the controversy is not ripe because plaintiffs have an available administrative remedy which they have not yet exhausted. However, as discussed above with respect to the *Younger* abstention, plaintiffs are not required to take this administrative avenue. Therefore, this basis for dismissal on ripeness grounds is rejected.

14. The State defendants also cite *Armstrong* to support their claim that the plaintiffs have not shown the requisite immediacy of the harm from which they are seeking relief. That case, however, is readily distinguishable from the instant one. In *Armstrong,* shareholders brought suit to challenge the constitutionality of an anti-takeover statute. *Id.* at 407–08. Their action was filed the same day that the law was passed, even before it had been applied to them. The plaintiffs in the present case, however, have sought redress *after* they have been subjected to the allegedly unconstitutional policies and conduct of the defendants.

equity, or other proper proceeding for redress.... 

42 U.S.C. § 1983. Although the complaint clearly alleges deprivation of rights secured by the Constitution—Free Exercise of Religion—the State defendants claim that they were not acting under color of state law.

■ To determine if a challenged action was performed "under color of law," it must be determined "whether the state was sufficiently involved to treat that decisive conduct as state action." [15] *McKeesport Hospital v. Accreditation Council for Graduate Medical Education*, 24 F.3d 519, 524 (3d Cir.1994). Here, the Medford defendants were employed by an arm of the state and worked within a state-funded school system. Obviously, the State defendants were employees of the state and their conduct was directly attributable to their employer. For the purposes of this motion, the plaintiffs have sufficiently alleged deprivations caused by the State defendants that, if true, could entitle the plaintiffs to relief. Under the present circumstances, both the Medford and the State defendants clearly acted under the color of state law.

### 2. *First Amendment: Freedom of Expression*

■ The plaintiffs claim that the Medford defendants denied Z.H. his constitutional right to freedom of expression when they changed the location of Z.H.'s poster of Jesus and when they "arbitrarily and unreasonably prohibit[ed] him from reading his proposed story to his classmates." Pls.' Br. at 6. In analyzing this claim, like all free speech claims, the first inquiry must be whether or not the activity was conducted in a public forum. This issue is decided easily, as the plaintiffs do not offer any evidence or deny that Z.H.'s school or classroom were not public forums, and this conclusion is consistent with case law.[16]

■ Speech uttered in a non-public forum may be subject to time, place and manner regulations, and these regulations must be viewpoint-neutral and reasonably related to a legitimate governmental purpose.[17]

15. Two other tests utilized by the Supreme Court include whether "the private entity has exercised powers that are traditionally the exclusive prerogative of the state," *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir.1995) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004–05, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982)); and whether "[t]he State has so far insulated itself into a position of interdependence with ... [the acting party] that it must be recognized as a joint participant in the challenged activity." *Mark*, 51 F.3d at 1142 (quoting *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961)), *cert. denied*, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1985) (alterations in original). These tests are not applicable here.

16. The United States Supreme Court has held that

school facilities may be deemed to be public forums only if school authorities have "by policy or by practice" opened those facilities "for indiscriminate use by the general public," or by some segment of the public, such as student organizations. If the facilities have instead been reserved for other intended purposes, "communicative or otherwise," then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community.

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 108 S.Ct. 562, 568, 98 L.Ed.2d 592 (1988) (citations omitted).

It is clear that Z.H.'s school and classroom were not public forums. This conclusion is also strongly supported by the fact that Z.H.'s teacher reserved the right to inspect and reject each child's reading selection before it was presented to the class.

17. Regarding nonpublic forums, the Eight Circuit observed that, "[i]n addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Families Achieving Independence and Respect v. Nebraska Department of Social Services*, 111 F.3d 1408, 1419 (8th Cir.1997).

While the heart of the defendants' power to regulate its students' speech lies in the fact that the school is not a public forum, it should also be noted that "the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,' and must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood*, 484 U.S. at 266, 108 S.Ct. at 567 (citations omitted) (quoting *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986), and

In the context of the classroom, the inquiry is more specific: educators may "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988).[18] The plaintiffs concede that this is the applicable standard, however, they contend that there were no legitimate pedagogical concerns in taking down Z.H.'s poster of Jesus and not allowing Z.H. to read the "Beginner's Bible" to his classmates.[19]

■ Z.H. had no constitutional right to have the poster of Jesus displayed in any particular location; therefore, relocating the poster to a less conspicuous position on the wall was not a restriction on his speech. Even assuming *arguendo* that his freedom of speech was impinged, "content-based restrictions on speech need only be 'reasonable in light of the purpose served by the forum and ... viewpoint neutral.'" *Duran v. Nitsche*, 780 F.Supp. 1048, 1052 (E.D.Pa.1991).

■ The plaintiffs argue that the Medford defendants were not "viewpoint neutral" because they regulated Z.H.'s poster and book on the basis of their religious origin. However, "viewpoint neutral" does not mean that any regulation that touches upon the viewpoint of the speech is prohibited, but rather that regulations must be based solely on pedagogical concerns rather than a particular point of view. *See Duran*, 780 F.Supp. at 1052 ("In the educational setting, the standard for determining the reasonableness of a content-based restriction on school sponsored expressive activity in a non-public forum is

whether the restriction is 'reasonably related to legitimate pedagogical concerns.'" (quoting *Hazelwood*, 484 U.S. at 273)).

Both incidents—relocating the poster of Jesus and disallowing Z.H. to read the "Beginner's Bible" to his class—were reasonably related to legitimate pedagogical concerns. In fact, as the Medford defendants note, if the school had replaced the poster in a more prominent position because it depicted Jesus Christ, or even to counterbalance inferences of religious discrimination, the school could have run afoul of the Establishment Clause. *See Washegesic v. Bloomingdale Public Schools*, 33 F.3d 679 (6th Cir.1994) (finding public school's display of portrait of Jesus violated Lemon test and Establishment Clause), *cert. denied*, 514 U.S. 1095, 115 S.Ct. 1822, 131 L.Ed.2d 744; *see also Roberts v. Madigan*, 921 F.2d 1047 (10th Cir.1990) (holding school's removal of Bible and other religiously oriented books from library and the school's forbidding teacher from reading Bible silently during class hours did not violate Establishment Clause or free speech rights of teacher), *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 896.

Furthermore, had the Medford defendants allowed Z.H. to read the "Beginner's Bible" to the rest of his first grade classmates, the possibility exists that they could have construed the presentation to be an endorsement of the Bible by the teacher. The plaintiffs note that the story Z.H. chose was fairly innocuous, and claim that "[h]ad Plaintiff's book had a different cover and had the characters had names like Joe and Ed, it is beyond issue that the plaintiff would have been allowed to read his story to the class." Pls.' Br. at 13–14. This is precisely true. Z.H. was not allowed to read the book to his

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969)).

**18.** The *Hazelwood* court noted that "[t]he question whether the First Amendment requires a school to tolerate particular student speech ... is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech." *Hazelwood*, 484 U.S. at 270–71, 108 S.Ct. at 569–70. "Educators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons

the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id.* at 271, 108 S.Ct. at 570.

**19.** The plaintiffs point out that the story contained "no vulgar, ungrammatical, poorly written, or overly complex material unsuitable for a class of first graders." Pls.' Br. at 9. While this is arguably correct, these are not the sole pedagogical considerations in determining whether or not material is suitable for students.

classmates during class time because it was The Bible, a religious book that constitutes the very foundation for a number of, but obviously not all, religions.[20] It is irrelevant that the story had no overt religious theme; the speech was the book itself.[21] If Z.H.'s teacher were to praise him for completing his reading assignment skillfully, (i.e. by saying something like "very good"), it is not unlikely that a child in first grade could interpret that comment as an endorsement of the story and the book. *See* Medford Defs.' Br. at 21. Therefore, allowing Z.H. to read the "Beginner's Bible" only to his teacher was a proper accommodation of Z.H.'s right of free expression and the principle of separation of church and state.

3. *First Amendment; Establishment Clause*

In very strong terms, the plaintiffs claim that the Medford defendants' actions constituted "nothing short of religious cleansing." Pls.' Br. at 13. Moreover, they claim that the defendants have established a "religion of secularism" by their alleged hostility towards religion. The defendants, however, maintain that their actions were not motivated by any prejudice and that their actions were proper under *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[22]

 To be sure, "[a] proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion, . . . favoring neither one religion over others nor religious adherents collectively over nonadherents." *Board of Education of Kiryas Joel Village School District v. Grumet,* 512 U.S. 687, 696, 114 S.Ct. 2481, 2487, 129 L.Ed.2d 546 (1994) (internal citations omitted). To determine whether the practice violates the Establishment Clause, the practice must be analyzed under the three-part test elucidated by the United States Supreme Court in *Lemon v. Kurtzman.*[23] This test states that a government practice regarding religion "will not offend the Establishment Clause if (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not create an excessive entanglement of the government with religion." *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Board of Education,* 84 F.3d 1471, 1483 (3d Cir. 1996) (quoting *Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111).

 The Medford defendants concede that the poster was removed and relocated because it had a religious theme. Medford Defs.' Br. at 19. Nonetheless, the defendants' actions neither advanced nor inhibited reli-

**20.** Obviously, if Z.H. was prohibited from reading the book solely because it was a Christian book while other students were allowed to read non-Christian religious books, this restriction would not have been viewpoint neutral.

**21.** In their brief, the plaintiffs respond to a statement allegedly uttered by Z.H.'s principal, where she told C.H. that the reading of the Bible story had the potential of offending Muslim, Hindu or Jewish students. The plaintiffs state that:

the characters of the story came from the Old Testament and therefore could hardly be offensive to Jewish students, Esau is considered a progenitor of the Arab race and therefore the story could hardly be considered offensive to Muslim students and since the proposed story contained no scriptural verse, reference to a deity or other religious doctrine, it could hardly be said to be offensive to Hindu or that matter even atheistic students.

Pls.' Br. at 3–4. This argument misconstrues the basic legal issue of this case. The issue is not whether the story was offensive or actually did offend, but whether the defendants acted consti-

tutionally when they allowed Z.H. to read his "Bible" only to his teacher rather than his entire class of public school students. Even if every single student, teacher and administrator in Z.H.'s public school were strong adherents to Christianity, the Medford defendants' actions would still be appropriate.

**22.** While this motion was pending, the Supreme Court decided *Agostini v. Felton,* — U.S. —, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). *Agostini* overruled *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) and held that the Establishment Clause did not prohibit public school teachers from going into parochial schools to provide remedial education pursuant to a federally funded government program. It has no relevance to the instant case.

**23.** While the *Lemon* test's viability has been repeatedly called into question, it remains the law of the land and must therefore be applied by this court. *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Board of Education,* 84 F.3d 1471, 1484 (3d Cir.1996).

gion, nor did the defendants create an excessive entanglement with religion. As mentioned above, Z.H. had no constitutional right to have his religious poster displayed prominently in his public school, therefore merely relocating it had no impact on his, or anyone else's religion. Furthermore, the defendants did not create or foster any sort of government involvement with religion by the simple act of relocating the poster.

 Neither did prohibiting Z.H. from reading the "Beginner's Bible" to his class violate the Establishment Clause. Z.H.'s teacher properly exercised her editorial control over the students' reading selections to ensure the material was appropriate for their educational level. This obviously concerns more than just determining whether or not the selection was grammatically correct or lewd, but deciding whether or not the themes the selection presented were suitable for a first-grade class. At this age, it is quite reasonable to assume that these children could have been easily confused whether or not Z.H.'s teacher merely let Z.H. read his book, or if she approved of its message. Presenting the book to the teacher for approval was part of the standard procedure of that class activity; consequently, the books that were allowed to be read were those approved of by the teacher. It is likely that some first-grade students would not fully understand all of the reasons why something could be unsuitable for use in a school activity and could instead believe that the books Ms. Oliva allowed to be read were those books that she liked or those with which she personally agreed.

Moreover, the plaintiffs have not shown how Z.H.'s teacher's actions advanced or inhibited religion in any sense. She never did or said anything regarding his faith. On the contrary, she let him read the "Bible" to himself during his free periods. Z.H. was merely forbidden from reading the book to his classmates during school hours, and this did not affect the practice of a tenant of his religion or his religion in general. Finally, no excessive entanglement was created by this act. Accordingly, the Medford defendants did not violate the Establishment Clause.

### 4. *Injunctive Relief against the State Defendants*

 Plaintiffs demand that the State defendants implement a policy

> wherein students may express their religious beliefs in the form of reports, homework, art work and other class work, free of discrimination based on the religious content of their submissions and a policy prohibiting teachers from modifying or excluding religious views from assignments when such religious views would otherwise be germane to the assignment.

Compl. at ¶ 32.

 This request is the product of false premises and exemplifies the continuing struggle to find a balance in ensuring students' rights to exercise their religion in our public schools without violating the historic separation of church and state. Public schools are not hostile toward religion. Any student who wishes to say grace over lunch or appeal for divine intervention during a test has that right. Students are also not precluded from expressing their religious views in assignments. Indeed, Z.H. was allowed to make a poster of Jesus, and was also allowed to read his "Beginner's Bible" as part of a school assignment. Furthermore, neither his poster nor his reading selection were altered in any way by his teacher or any other school official. Z.H. was just not permitted to express the religious beliefs contained in his work to his classmates through the medium of the public school. The school did not forbid him from practicing his religion, it merely chose to tread lightly around creating the impression that it endorsed his religious views.[24] It did so within the boundaries of the constitution.

 Religious liberty as guaranteed in the Bill of Rights allows individuals to decide if they want to be religious and, if so, how to practice their religion free from coercion or

---

**24.** In any event, based on the foregoing analysis and conclusion, the plaintiffs have no right to any remedy because they have suffered no cogni-

zable harm to any constitutionally protected right.

control. The state defendants should not be asked to involve themselves in religious matters concerning its students. Far from protecting religious freedom, implementing the policy requested would endanger fundamental religious liberties.

### CONCLUSION

For the foregoing reasons the motion of (1) defendants Medford Township Board of Education, Grace Oliva, Gail Pratt, and Patrick Johnson (the "Medford defendants"), and (2) defendants State of New Jersey Department of Education and Leo Klagholz, Commissioner of the State of New Jersey Department of Education (the "State defendants"), for judgment on the pleadings pursuant to FED. R.CIV.P. 12(c) is granted.